# STATE OF WEST VIRGINIA
## SUPREME COURT OF APPEALS

Barry W.,
Petitioner Below, Petitioner

**FILED**

June 24, 2013
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

vs)  No. 12-0795 (Mercer County 10-C-294)

David Ballard, Warden,
Respondent Below, Respondent

## MEMORANDUM DECISION

Petitioner Barry W.,[1] by counsel Thomas J. Gillooly, appeals the circuit court's order denying his petition for writ of habeas corpus. Respondent Warden Ballard, by counsel Thomas W. Rodd, filed his response to which petitioner replied.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision is appropriate under Rule 21 of the Rules of Appellate Procedure.

Petitioner was tried in a four-day trial, beginning December 7, 2001, and the jury found him guilty of thirty-one counts of first degree sexual assault and seventy-three counts of sexual abuse by a custodian. At trial, petitioner was represented by court-appointed counsel, Susan E.F. Henderson and Thomas L. Fuda. Petitioner's wife, Jennifer W., the mother of the alleged abused children, was charged but was not tried with petitioner.[2] The matters were handled as consolidated cases until trial. The children, D.H., St.H., Sh.H., and M.H., were ages ten, eight, six and four, respectively, at the time of the August 1, 2001, pre-trial hearing, approximately two years after the alleged criminal conduct.

Prior to trial, the children spoke with Phyllis Hasty, a therapist. The defense filed a motion to suppress Ms. Hasty's testimony, but that motion was denied by the circuit court approximately one month prior to trial. Petitioner claimed that the indictment failed to describe conduct with sufficient specificity to give him notice of the charges, but the trial court overruled those objections.

---

[1]Because the victims in the underlying case were minors, we follow our traditional practice in cases involving sensitive facts and use only petitioner's last initial. *See State v. Edward Charles L.*, 183 W.Va. 641, 645 n.1, 398 S.E.2d 123, 127 n.1 (1990).

[2]Jennifer W. was represented by the Office of the Public Defender and pled guilty to four counts of child neglect resulting in injury.

1

During trial, Ms. Hasty was called as the State's expert therapist. She testified about the alleged victims, although none of the victims testified. Petitioner claims that the State failed to produce and "apparently destroyed" letters written by petitioner, but the circuit court allowed testimony by prison informants regarding the letters' contents, which included references to the alleged crimes. Petitioner states that the defense did not question or challenge the assistant prosecutor's representations about what the State did with the letters themselves. Petitioner also claims that the children had been sexually abused by their natural father before petitioner met them.

After his conviction, petitioner was sentenced to imprisonment for indeterminate terms of fifteen to thirty-five years on each of the thirty-one counts of first degree sexual assault and indeterminate terms of ten to twenty years on each of the seventy-three counts of sexual abuse by a custodian. Four of the fifteen to thirty-five year counts and four of the ten to twenty year counts were ordered to run consecutively.

Petitioner's trial counsel, Susan E.F. Henderson, appealed his conviction to this Court in *State v. Barry W.,* Appeal No. 022194, which was refused by this Court. A petition for writ of habeas corpus was filed on November 30, 2005, setting forth seven grounds: 1) ineffective assistance of counsel relative to the testimony of Phyllis Hasty and Dr. George Wallace, who examined at least two of the children; 2) violation of the right of confrontation relative to the testimony of Ms. Hasty and Dr. Wallace; 3) ineffective assistance of counsel related to a portion of Ms. Hasty's testimony; 4) ineffective assistance of counsel related to defense counsel eliciting testimony regarding petitioner's prior conviction for manslaughter without a cautionary or limiting instruction; 5) ineffective assistance of counsel related to defense counsel eliciting testimony regarding Jennifer W.'s conduct with the children, the termination of her parental rights, and failing to request a cautionary instruction; 6) due process related to the use of jailhouse inmates; and 7) ineffective assistance of counsel based on the failure to properly investigate or conduct discovery. That habeas petition included a *Losh* checklist with a number of additional grounds checked. The circuit court denied the petition on January 20, 2006, without holding a hearing. Petitioner's counsel, David C. Smith, appealed the circuit court's denial of habeas relief to this Court. This Court denied that appeal by order entered September 7, 2006. On July 17, 2006, David Smith filed another appeal of the denial of the writ of habeas corpus at *Barry W. v. McBride,* Appeal No. 061992. That petition was refused by this Court on September 7, 2006.

On September 13, 2007, petitioner filed a federal habeas petition, No. 1:07-cv-00567 in the District Court for the Southern District of West Virginia. That action is still pending and is stayed pending the resolution of the instant action. Petitioner's current counsel, Mr. Gillooly, was appointed by Judge R. Clarke VanDervort in the federal habeas proceeding. Judge VanDervort stayed the federal habeas action to allow petitioner to exhaust all of his grounds for habeas relief.

When petitioner filed his addendum to his petition for writ of habeas corpus in the circuit court on July 13, 2010, the circuit court appointed Mr. Gillooly to represent petitioner in this matter. A status hearing was held on July 21, 2010, and an omnibus hearing was set for May 4, 2011. Following the conclusion of discovery, the circuit court conducted an evidentiary hearing

2

during which both of petitioner's trial counsel testified. Due to discovery issues, the final omnibus hearing was rescheduled for August 22, 2011. The deposition testimony of former Assistant Prosecutor, Deborah Garton, who tried the case, and State Police Sargent Melissa Clemons, the principal investigator, were admitted into evidence. The video deposition of Dr. Bobby Miller, petitioner's expert, was also received into evidence. Petitioner argued that Dr. Miller's testimony further undermined the trial testimony of the State's expert play therapist, Ms. Hasty. Following the hearing, the circuit court entered a seventy-page order denying petitioner's requested habeas relief. It is from that order that petitioner appeals.

This Court reviews appeals of circuit court orders denying habeas corpus relief under the following standard:

> "In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review." Syllabus point 1, *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006).

Syl. Pt. 1, *State ex rel. Franklin v. McBride*, 226 W.Va. 375, 701 S.E.2d 97 (2009).

In his petition for appeal, petitioner asserts three assignments of error. Petitioner first asserts that the circuit court wrongly concluded that the State was not obligated to produce letters in which petitioner allegedly confessed and wrongly concluded that trial counsel were not ineffective, despite their failure to demand production of the letters and their failure to move to prevent hearsay testimony by jailhouse witnesses. The circuit court thoroughly analyzed the legal standards set forth in *State v. Osakalumi*, 194 W.Va. 758, 461 S.E.2d 504 (1995), and determined that it does not apply in this matter. The circuit court detailed its reasons for this finding, including the fact that the evidence destroyed in this matter was not exculpatory evidence and the letters written by petitioner were found to be exceptions to the hearsay rule because they contained admissions to his crimes.

Petitioner's second assignment of error is that the circuit court wrongly failed to conclude that petitioner's trial counsel were ineffective, despite their failure to object to the admission of Ms. Hasty's opinion that petitioner was guilty and that the alleged child victims were credible. Petitioner alleges that counsel also failed to challenge the lack of foundation for other prejudicial hearsay testimony presented in the guise of expert opinion. Petitioner claims that "play therapist" Ms. Hasty was permitted to offer opinion testimony regarding the truthfulness of the child victims' out-of-court statements. In its order, the circuit court addresses both the foundation for Ms. Hasty's testimony and petitioner's contention that Ms. Hasty testified regarding the "ultimate issue." As set forth by the circuit court, the trial record showed that the two older children were taken to Ms. Hasty for therapy purposes by the foster parents when the children were acting out in inappropriate ways. Arguments were presented by the defense in support of suppressing Ms. Hasty's testimony, but the trial court denied the same. The circuit court also determined that counsel were not surprised by Ms. Hasty's testimony and were amply prepared to cross-examine her.

3

Petitioner's final assignment of error is that counsels' performance was constitutionally ineffective, requiring that petitioner's conviction be vacated. In support of this argument, petitioner contends that trial counsel's failure to raise the *Osakalumi* issue or to properly object to Ms. Hasty's testimony amounts to ineffective assistance of counsel. *Osakalumi, supra.* Petitioner also argues that permitting the State to present oral testimony from prison informants regarding letters allegedly written by petitioner was tantamount to a confession by petitioner. The following standard is applied to claims concerning ineffective assistance of counsel:

> In the West Virginia courts, claims of ineffective assistance of counsel are to be governed by the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984): (1) Counsel's performance was deficient under an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different.

Syl. Pt. 5, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). The circuit court noted the distinction between the *Osakalumi* matter involving exculpatory evidence and the present proceeding where petitioner's letters were clearly incriminating. The circuit court set forth additional reasons why the *Osakalumi* decision does not apply. Moreover, the subject of the letters was undoubtedly a statement against petitioner's interest. Petitioner has failed to meet his burden of establishing ineffective assistance of counsel under this standard.

Having reviewed the circuit court's "Order" entered on April 26, 2012, we hereby adopt and incorporate the circuit court's well-reasoned findings and conclusions as to the assignments of error raised in this appeal. The Clerk is directed to attach a copy of the circuit court's order to this memorandum decision.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:** June 24, 2013

**CONCURRED IN BY:**

Chief Justice Brent D. Benjamin
Justice Robin Jean Davis
Justice Margaret L. Workman
Justice Menis E. Ketchum
Justice Allen H. Loughry II

**COPY**



12-0795

NOTED CIVIL DOCKET

APR 26 2012

JULIE BALL
CLERK CIRCUIT COURT
MERCER COUNTY

## IN THE CIRCUIT COURT OF MERCER COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA, *ex rel.,*
BARRY W                            PETITIONER,

VS.                       CIVIL ACTION NO.: 10-C-294-OA

DAVID BALLARD, WARDEN
MOUNT OLIVE CORRECTIONAL COMPLEX,          RESPONDENT.

## ORDER

On the 4th day of November, 2011, this matter came before the Court for a hearing on the Petitioner's Petition for Post-Conviction Habeas Corpus Relief, brought pursuant to the provisions of Chapter 53, Article 4A, of the West Virginia Code, as amended, which was filed on his behalf by and through his Court-Appointed Counsel, Thomas J. Gillooly, Esq., and on the Petitioner's Addendum to Petitioner for Writ of Habeas Corpus.[1] The Petitioner appeared in person and by counsel, Thomas J. Gillooly, Esq. and Melissa D. Davis, Esq. appeared on behalf of the Respondent.[2]

The Petitioner is seeking post-conviction habeas corpus relief from his April 22, 2002 indeterminate sentences of not less than fifteen (15) nor more than thirty-five (35) years for each of the thirty-one (31) criminal offenses of Sexual Assault – First Degree, and of not less than ten (10) nor more than twenty (20) years for each of the seventy-four (74) criminal offenses of Sexual Abuse by a Custodian for which he was convicted. Four of the 15 to 35 years sentences

---

[1] The Petitioner, by counsel, David C. Smith, Esq., had previously filed a Petition for habeas relief on November 30, 2005 in Mercer County Civil Action No. 05-C-769-F. The Petition was denied by Order entered on January 20, 2006, without an omnibus hearing ever having taken place. The Petitioner appealed the order deying relief, which was subsequently refused by the West Virginia Supreme Court of Appeals. On September 13, 2007, the Petitioner, by counsel, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of West Virginia. That proceeding has been stayed pending resolution of this proceeding.
[2] Melissa D. Davis, Esq. was substituted as counsel for the Respondent by Order of Appointment of Special Prosecutor entered on February 7, 2011.

1

and four of the 10 to 20 years sentences were ordered to run consecutively with one another by the Honorable Judge John R. Frazier. The effect of the Court's sentence in this case is that the Petitioner must serve a minimum sentence of one hundred years in the penitentiary. He faces a possible maximum sentence of two hundred and twenty (220) years in the penitentiary before he is eligible for release, absent a showing that he is being unlawfully detained due to prejudicial constitutional error(s) in the underlying criminal proceedings.

## I.    FACTUAL/PROCEDURAL HISTORY

### Mercer County Criminal Action Number 01-F-30-F

### A.    The Indictment

By a True Bill returned by the February 2001 term of the Mercer County Grand Jury, the Petitioner, Barry    W    , was indicted in a one hundred and twenty (120) count indictment for the offenses of Sexual Assault – First Degree and Sexual Abuse by a Custodian. The victims, D.H. (a female child), St.H. (a male child), Sh.H. (a female child) and M.H. (a male child)[3] were the Petitioner's former wife's children.

### B.    Counts Specific to Each Offense

Out of the one hundred and twenty (120) count indictment, eighty-one (81) counts are for Sexual Abuse by a Custodian, namely, Counts 2, 4, 6, 9, 10, 11, 12, 14, 16, 18, 21, 22, 23, 24, 26, 28, 30, 33, 34, 35, 36, 38, 40, 42, 42, 45, 46, 47, 48, 50, 52, 54, 57, 58, 59, 60 (each with respect to D.H.); Counts 61, 62, 63, 65, 67, 69, 70, 71, 73, 74, 75, 77, 78, 79 (each with respect to St.H.); Counts 66, 81, 82, 83, 85, 86, 87, 89, 90, 91, 93, 94, 95, 97, 98, 99 (each with respect to Sh.H.); and Counts 101, 102, 103, 105, 106, 107, 109, 110, 111, 113, 114, 115, 117, 118, 119

---

[3] Due to the sensitive matters in this case, the Court adheres to the common practice of using initials instead of the names of the young victims.

2

(each with respect to M.H.); and thirty-nine (39) of the counts are for Sexual Assault – First Degree, namely, Counts 1, 3, 5, 7, 8, 13, 15, 17, 19, 20, 25, 27, 29, 31, 32, 37, 39, 41, 43, 44, 49, 51, 53, 55, 56 (each with respect to D.H.); Counts 64, 68, 72, 76, 80 (each with respect to St.H.); Counts 84, 88, 92, 96, 100 (each with respect to Sh.H.); and Counts 104, 108, 112, 116, 120 (each with respect to M.H.). All Counts contained in the indictment stemmed from incidents allegedly occurring during July through November, 1999.

## C.    Pre-Trial Proceedings

Upon the return of the above-referenced indictment, the Petitioner was to appear for arraignment on February 20, 2001, however, having failed to do so, a bench warrant was issued for his arrest. The Petitioner was apprehended in the State of Kansas, and was returned to West Virginia and appeared before Judge John R. Frazier on April 24, 2001. Judge Frazier appointed Thomas L. Fuda, Esq. and Susan E. F. Henderson, Esq. to serve as the Petitioner's counsel and set the matter for trial on August 14, 2001.

The Petitioner's counsel, on his behalf, filed an omnibus motion for discovery and a motion for the Grand Jury minutes. The Court granted the Petitioner's motion permitting him and his counsel access to the Grand Jury minutes that were electronically recorded and permitting them leave to duplicate said minutes.

By Agreed Order entered on July 26, 2001, the Petitioner and the Prosecuting Attorney agreed that certain medical evidence and evidence of treatment of the children in the criminal matter were of relevance and material to the trial. The parties agreed that Judge John R. Frazier would be provided copies of these records from Southern Highlands Community Mental Health Clinic, Family Services of Kanawha Valley, and Dr. George Wallace of Lewisburg, West

3

Virginia for an *in camera* review to determine relevancy, and should same be determined relevant, would be provided to counsel.

Additionally, the trial court granted the Petitioner's counsel advance approval for appointed attorney to incur expenses in excess of the statutory limit by order entered on July 26, 2001; counsel for the Petitioner were approved for payment of direct expenses for William Lunsford, an expert retained on the Petitioner's behalf who performed the Petitioner's polygraph examination on June 20, 2001.

On July 26, 2001, the Petitioner's counsel filed a motion to suppress flight evidence concerning his move from the State of West Virginia in December of 2000 arguing that he was not under arrest; that he had not been under indictment at the time; and that he was unaware he was a suspect in the case. Additionally, the Petitioner's counsel filed a motion for a change of venue due to the pretrial publicity received in the case. These motions were heard on August 1, 2001, which were taken under advisement until November 2, 2001, to be heard again; counsel for the Petitioner moved the trial court for a continuance, to which the Petitioner agreed to waive his right to a speedy trial and same was rescheduled to the October 2001 Term of Court, with a trial date beginning on December 4, 2001 at 9:30 a.m.

Also during the August 1, 2001 motions hearing, the State orally moved the trial court for a *Daubert* hearing concerning the Petitioner's intended expert testimony and a request for examinations.[4] The trial court granted the motion and further instructed the State to provide the Petitioner with the reports generated by Susan McQuaide in the matter. The *Daubert* hearing

---

[4] Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), a court conducts an inquiry into the validity of the underlying science, looking at the soundness of the principles or theories and the reliability of the process or method as applied to the case. "The problem is not to decide whether the proffered evidence is right, but whether the science is valid enough to be reliable." *See, San Francisco v. Wendy's Intern., Inc.,* 221 W. Va. 734, 743 (2007).

4

was also scheduled for November 2, 2001. Further, the trial court granted the Petitioner's motion to be transported to the Department of Behavioral Medicine & Psychiatry in Morgantown, West Virginia to undergo an ABEL testing ostensibly to provide test results indicating that the Petitioner did not have a lustful disposition towards children.

During the August 1, 2001 motions hearing, the trial court heard, both the Petitioner's and the Petitioner's former wife and co-Defendant, Jennifer W      notions to suppress the children's disclosures made to Phyllis Hasty. The purpose of the Petitioner's co-Defendant's motion was to determine the admissibility of Phyllis Hasty's expert testimony in light of Justice Starcher's concurrence in *State v. Pettrey*, 209 W. Va. 449 (2001) wherein he cited *Ring v. Erickson*, 983 F.2d 818 (8th Cir. 1992). The Petitioner's co-Defendant argued, unsuccessfully, that the statements the children made during their treatment sessions with Ms. Hasty should not be afforded special credibility envisioned under the medical purpose or diagnosis hearsay exception under Rule 803(4) of the West Virginia Rules of Evidence because the children were unaware of the purpose of their visits to Ms. Hasty, thereby their motives in providing the disclosures are not necessarily reliable. However, the trial court determined that Phyllis Hasty's testimony concerning the children's statements made to her during therapy was previously adjudicated expert opinion testimony pursuant to the majority ruling in *Pettrey* and therefore admissible.

On August 7, 2001, the State moved the trial court directing Steve Ferris of Pathways Psychological Center to release any and all records that he had in his possession pertaining to the child victims in the case; the motion was granted by order on the same date. Subsequently, the State made the same motion on November 2, 2001, that all records possessed by Steve Ferris be

5

released to both the Petitioner and his co-Defendant and to the State, which was also granted on the same date.

Following the August 1 hearing, on October 3, 2001, the Petitioner by counsel moved the trial court to be provided with a complete copy of the records maintained by Phyllis Hasty and Southern Highlands Community Mental Health Center in order for the Petitioner's own experts to review for their evaluation, particularly concerning the records containing information pertaining to time frames of events and disclosures. This motion was granted by order entered on October 10, 2001.

On November 2, 2001, the State moved to introduce 404(b) evidence concerning the Petitioner's alleged homicide of Linda B⸱      ⸱, the Petitioner's former girlfriend. The State desired to introduce the prior bad acts evidence allegedly because two of the children victims in the case expressed fear of the Petitioner during the relevant time period because the Petitioner bragged about killing his girlfriend and threatened to kill the children victims if they reported his abusive acts, and the children did not report the abuse until after they were removed from the home they shared with the Petitioner.

At the motions hearing on November 2, 2001, both the Petitioner and his co-Defendant, Jennifer W⸱    , appeared in person and by counsel. The trial court heard the testimony of Dr. W. Joseph Wyatt and Dr. David Estep, expert witnesses for the Petitioner as well as for co-Defendant Jennifer W⸱     The purpose of Dr. Wyatt's testimony was to discredit the validity of the disclosures made by the children during play therapy with Phyllis Hasty, to the extent that Ms. Hasty did not refer the children out for a proper forensic interview and based on his opinion of proper standards for interviewing child victims in sexual abuse cases. At the conclusion of Dr. Wyatt's testimony, the State moved to exclude him from testifying at trial on

6

the basis that he was not an expert in play therapy and that the testimony would confuse the purposes of therapy versus forensic interviews. The trial court denied the State's motion to exclude Dr. Wyatt's testimony.

The next defense expert witness called to testify during the November 2, 2001 motions hearing was Dr. David Larry Estep, Jr. The purpose for Dr. Estep's testimony was to introduce at trial the results of the Petitioner's psychiatric testing[5] which indicated that the Petitioner demonstrated a low sexual interest in children with a reasonable degree of medical certainty: Basically, the Petitioner does not have a lustful disposition towards children.[6] The State called Mr. Steve Ferris, a licensed psychologist to counter the testimony of Dr. Estep, calling into question the validity of the test results performed on the Petitioner. At the conclusion of the expert witnesses' testimonies, the trial court took the State's motion to exclude the testimony of Dr. Estep under advisement.

The trial court denied the defense motions to suppress the children's statements disclosed to Phyllis Hasty[7], and as a result, the Petitioner withdrew his motion to exclude testimony by Ms. Susan McQuaide, who conducted the initial forensic interview on the children.

Additional pre-trial motions included the State's motion to exclude evidence of other sexual assaults on the children based on the Rape Shield Statute.[8] The State sought to prohibit evidence of the children's disclosures that their biological father had sexually abused them.

---

[5] The Abel Assessment of Sexual Interest – Dr. Estep testified that although he was not trained to administer the ABEL test, he conceded that the test was not to be used to determine whether a specific offense occurred or not. See Transcript, November 2, 2001, *passim*.

[6] See Transcript November 2, 2001, page 114, lines 2 – 3.

[7] The court order entered on the same date, stated that, "Whereupon, the defendant, by counsel, moves the Court to exclude the testimony of Phyllis Hasty; to which motion the Court DENIED." There is no reference as to which defendant (the Petitioner or his co-Defendant) brought the motion, however, the transcript of the November 2, 2001 hearing indicated that the motion was brought by counsel on behalf of both the Petitioner and Jennifer W. (See Transcript, November 2, 2001, *passim*).

[8] W. Va. Code § 61-8B-11.

7

Later, the State withdrew its motion, conceding that the Rape Shield Statute did not apply in this context.

The Petitioner's motion to exclude evidence of flight was denied, however, the trial court precluded the State from bringing in evidence of the forged checks or other crimes committed by the Petitioner and his co-Defendant during the flight, further, the trial court prohibited the State from mentioning that the Petitioner was featured on America's Most Wanted or other local news.[9]

The State sought to introduce evidence of the Petitioner's manslaughter conviction as the *res gestae*, to show evidence of the Petitioner's alleged threats to the children if they had disclosed the abuse, however, the trial court prohibited the State from mentioning the previous conviction and only permitted evidence of general threats that were allegedly made toward the children.[10]

The Petitioner was also unsuccessful in suppressing the three female inmates' testimonies concerning the content of the letters he had written to his then wife, co-Defendant Jennifer W!    , who was also an inmate in Southern Regional Jail. The Petitioner argued that the marital privilege precluded admission of the content of the letters; the Petitioner contended that he did not waive his marital privilege, and that the co-Defendant could not waive said privilege. Further, the Petitioner argued that the content of the letters was hearsay and the inmates' testimonies concerning what they read in the letters and how they learned the letters were from

---

[9] Trial Transcript, December 4 – 7, 2001, at page 161.

[10] The State had argued that the Petitioner's manslaughter conviction involved his former girlfriend and that the Petitioner allegedly bragged about killing his girlfriend in front of the children, thus creating a real fear in the children that the Petitioner would kill them if they had disclosed the abuse. The Petitioner subsequently was returned to prison due to a parole violation for that underlying charge. See Trial Transcript, December 4 – 7, 2001, at page 166.

the Petitioner was also hearsay.[11] During an *in camera* evidentiary hearing that was held during a break from the trial, the trial court found that the inmates testimonies concerning the Petitioner's alleged admissions of sexual misconduct with the children, specifically, D.H. and St.H., was admissible because the marital privilege did not apply where the Petitioner sent the letters to his mother, who would then remove the letters from the envelopes and forward them to his co-Defendant wife. The purpose behind using the third party intermediary was to avoid being caught with contraband, because the regional jail authorities prohibited inmates from writing each other letters. Because of the use of the third party (the Petitioner's mother), the trial court found that there was no expectation of privacy. Additionally, because letters to the jail are opened first and then forwarded to the appropriate recipient, an inmate at the jail has no expectation of maintaining confidences.[12]

Moreover, the trial court found that because the co-Defendant was unavailable to testify[13], and that due to exceptions to hearsay rules, the other inmates' testimonies concerning the letters' content was admissible because the co-Defendant's statement regarding the identity of the writer of those letters and what the letters entailed, that the Petitioner's statements within those letters were probative and trustworthy.[14]

### D.    Plea Agreement Negotiations

There appears to be little or no record of plea negotiations between the State and the Petitioner.

---

[11] The Petitioner argued there were at least two levels of hearsay: One where the co-Defendant told the inmates that the letters were from the Petitioner, the other where the Petitioner himself allegedly admits to the sexual abuse in the letters themselves.

[12] Trial Transcript, December 4 - 7, 2001, at page 419, lines 1 – 9.

[13] Her trial counsel advised the court that he would not allow her to testify at the Petitioner's trial; further she could have invoked her Fifth Amendment right not to testify. Trial Transcript, December 4 - 7, 2001, *passim*.

[14] Id. at pages 419 – 420.

### E. The Trial Verdict/Sentencing – Guilty/100 – 220 Years of Imprisonment

#### The Trial Verdict

The Petitioner's trial in the underlying criminal matter was held on December 4 through December 6, 2001. By the end of the trial, the jury returned the following verdict:

"Guilty" of Sexual Assault – First Degree in Counts 1, 3, 5, 13, 15, 17, 25, 27, 29, 37, 41, 49, 51, 53, 64, 68, 72, 76, 80, 84, 88, 92, 96, 100, 104, 108, 112, 116, and 120.[15]

"Guilty" of Sexual Abuse by a Custodian in Counts 2, 4, 6, 10, 11, 12, 14, 16, 18, 22, 23, 24, 26, 28, 30, 34, 35, 36, 38, 40, 42, 46, 47, 48, 50, 52, 54, 58, 59, 60, 61, 62, 63, 65, 66, 67, 69, 70, 71, 73, 74, 77, 78, 79, 81, 82, 83, 85, 86, 87, 89, 90, 91, 93, 95, 97, 98, 101, 102, 103, 105, 106, 107, 109, 110, 113, 114, 115, 118, and 119.[16]

#### Sentencing

Pursuant to the penalties prescribed by the West Virginia Code for the above offenses, on April 22, 2002, Judge John R. Frazier sentenced the Petitioner as follows:

[I]t is ORDERED that the said Barry White be taken from the bar of this Court to the Southern Regional Jail and therein confined until such time as the warden of the penitentiary can conveniently send a guard for him, and that he be taken from the Southern Regional Jail to the penitentiary of this State and therein confined for the indeterminate term of not less than fifteen (15) nor more than thirty-five (35) years as provided by law for each offense of "Sexual Assault – First Degree" as the State in Counts 1, 3, 5, 13, 15, 17, 25, 27, 29, 37, 41, 49, 51, 53, 64, 68, 72, 76, 80, 84, 88, 92, 96, 100, 104, 108, 112, 116, and 120 of its indictment herein hath alleged and by a jury hath been found guilty, and not less than ten (10) nor more than twenty (20) years as provided by law for each offense of "Sexual Abuse by a Custodian" as the State in Counts 2, 4, 6, 10, 11, 12, 14, 16, 18, 22, 23, 24, 26, 28, 30, 34, 35, 36, 38, 40, 42, 46, 47, 48, 50, 52, 54, 58, 59, 60, 61, 62, 63, 65, 66, 67, 69, 70, 71, 73, 74, 77, 78, 79, 81, 82, 83, 85, 86, 87, 89, 90, 91, 93, 95, 97, 98, 101, 102, 103, 105, 106, 107, 109, 110, 113, 114, 115, 118, and 119 of its indictment herein hath alleged and by a jury hath been found guilty;

---

[15] The Jury was instructed as to these Counts that one of two verdicts could be returned, namely, Guilty or Not Guilty.

[16] Again, the only two verdict choices instructed to the Jury was either Guilty or Not Guilty.

that the defendant's sentences as to Counts 1, 2, 72, 88, 89, 104 and 105 run consecutively with one another, and that the remaining counts run concurrently with each other and with Counts 1, 2, 72, 73, 88, 89, 104 and 105; that the defendant be given credit for one (1) year and twenty-nine (29) days on the sentence imposed in Count 1; and that he be dealt with in accordance with the rules and regulations of that institution and the laws of the State of West Virginia.

Thereupon, counsel for defendant notified the Court of their intent to appeal said judgement [sic] to the Supreme Court of Appeals. After due consideration, it is the ORDER and DECREE of this Court that Susan Henderson and Thomas L. Fuda are appointed to represent the defendant for his appeal process subject to filing a new financial affidavit, and the court reporter is directed to prepare trial transcripts of the proceedings in this matter.[17]

## F.     Appeal to the West Virginia Supreme Court of Appeals – Denied

### Grounds for Appeal

By Order entered on August 21, 2002, the Petitioner was given an additional two months in order to file his petition for appeal. On October 22, 2002, the Petitioner, by counsel, Susan E. F. Henderson, Esq. and Thomas L. Fuda, Esq., presented the West Virginia Supreme Court of Appeals with the Petitioner's Petition for Appeal from his convictions rendered against him in the Mercer County Circuit Court. The Petitioner's petition for appeal was based upon the following grounds:

1. The trial court erred in permitting hearsay testimonies of three female jailhouse inmates concerning unauthenticated letters written by the Petitioner to his wife which also violated the spousal communications privilege.

2. The Petitioner was denied his right to a fair trial because the trial court permitted the testimonies concerning the letters even though the Petitioner was not notified of the existence of such witnesses in a timely manner.

3. The Petitioner was denied his right to a fair trial because the trial court erred in not granting his motion to dismiss Counts 62, 63, 66, 67, 70, 71, 74, 75, 78, 79, 82, 83, 84, 86, 87, 88, 90, 91, 92, 94, 95, 96, 98, 99, 100, 102, 103, 104, 106, 107, 108, 110, 111, 112, 114, 115, 116, 118, 119 and 120.

---

[17] During the disposition hearing, counsel for the Petitioner renewed his motion to set aside the verdict of the jury and to grant him a new trial, however, the trial court denied the motion, to which the Petitioner objected, accordingly, the trial court overruled the Petitioner's objection as well.

11

4. The Petitioner was denied his right to a fair trial because the trial court erred in allowing the testimony of Phyllis Hasty.

5. The Petitioner was denied his right to a fair trial because the trial court erred in allowing evidence of flight.

6. The jury verdict should be set aside because the jury failed to consider and deliberate on each and every charge lodged against the Petitioner.

Although the Petitioner's trial/appellate counsel, Susan E. F. Henderson, Esq. argued the appeal before the West Virginia Supreme Court of Appeals, the Petition for Appeal was denied on May 13, 2003.

**G.     Miscellaneous Proceedings:**
**State v. Jennifer W   : Criminal Action No. 01-FE-31;**
**In the Interest of D.H., St.H., Sh.H. and M.H., Juvenile Proceeding No. 99-JA-79-82**

After the Petitioner's criminal trial, his co-Defendant, and then wife, Jennifer W    , entered a plea of guilty to four counts of lesser included offenses of child neglect resulting in injury on January 31, 2002. Mrs. W    was indicted in the February 2001 Term of the Grand Jury of twenty counts of Child Neglect Resulting in Serious Bodily Injury. She had also been indicted for forgery and uttering in criminal action number 01-FE-194, however, those offenses were dismissed in exchange for her guilty pleas. Judge John R. Frazier sentenced Mrs. W    to four consecutive sentences of one (1) to three (3) years in the penitentiary with credit for time served on the first count.

Additionally, Mrs. W    's children had previously been the subject of an earlier abuse and neglect proceeding that had stemmed from these and other sexual abuse allegations, resulting in Mrs. W    's parental rights being terminated to all four children by an order entered on September 7, 2000 by Judge John R. Frazier.[18] The children's biological father was later

---

[18] The abuse and neglect proceeding began on an imminent danger basis – the Petitioner herein was allegedly inebriated and attempted to leave the family residence when he hit the youngest child, M.H. (who was two years old

indicted for sexual abuse, wherein he entered a guilty plea to a single count of Sexual Abuse –

First Degree, and given a one (1) to five (5) year sentence on same in Mercer County Circuit

Court criminal action number 04-F-27.

## II.  MERCER COUNTY CIRCUIT COURT CIVIL ACTION NO. 05-C-769-F

### The First Petition for Writ of Habeas Corpus

On November 30, 2005, the Petitioner, by counsel, David C. Smith, Esq., filed his

initial petition for writ of habeas corpus.  The Petitioner, by counsel, filed the *Losh* grounds

checklist in which he asserted the following grounds[19]:

1.  Indictment shows on face no offense was committed
2.  Denial of counsel
3.  Failure of counsel to take an appeal
4.  Consecutive sentences for same transaction
5.  Suppression of helpful evidence by prosecutor
6.  State's knowing use of perjured testimony
7.  Ineffective assistance of counsel
8.  Double jeopardy
9.  Prejudicial joinder of defendants
10.  Nondisclosure of Grand Jury minutes
11.  Refusal to turn over witness notes after witness has testified
12.  Claims concerning use of informers to convict
13.  Constitutional errors in evidentiary rulings
14.  Claims of prejudicial statements by prosecutor
15.  Sufficiency of evidence
16.  Excessive sentence

All other available grounds were expressly waived.  The Petitioner's then habeas counsel, David

C. Smith, Esq., did not sign the checklist or the Petition, however, as pointed out by the

---

at the time) with his vehicle, causing the toddler injury. The mother, co-Defendant Jennifer W.    was a respondent in the action due to her denial of the domestic violence and drug abuse that went on in the home. The Petitioner had moved in with the children's mother, Jennifer W    , on the same day he was paroled for serving a lengthy prison term for voluntary manslaughter, sometime in July 1999. The couple married in August 1999. The children were subsequently removed from the W.    residence on or about November 18, 1999.

[19] Pursuant to *Losh v. McKenzie*, 166 W. Va. 762 (1981).

Petitioner's current habeas counsel, United States Magistrate Judge Van Dervort in an order dated October 15, 2009 concluded that Mr. Smith prepared the Petition, he just failed to sign it.

Almost all the grounds specified in the Petitioner's 2005 petition for habeas corpus center on ineffective assistance of trial counsel. The sub-grounds for same were as follows: (1) Counsel failed to object to the testimonial hearsay of Dr. Gregory Wallace and Phyllis Hasty; (2) Counsel failed to object to testimony from Phyllis Hasty that the Petitioner poisoned the children's Halloween candy; (3) Counsel elicited and failed to object to testimony concerning the Petitioner's prior arrest and incarceration for voluntary manslaughter – and that counsel also failed to request a cautionary instruction concerning the same; (4) Counsel elicited testimony concerning and failed to object to testimony regarding the mother, Jennifer W    's abuse of the children, including but not limited to repeated beatings, walking out of termination hearings, etc. – and again, counsel also failed to request a cautionary instruction regarding the same and that counsel also failed to object to or request a cautionary instruction concerning evidence of the mother's parental rights being terminated; (5) Counsel produced an expert and then failed to object to testimony from the expert that the Petitioner was a drunk, was incarcerated and had a criminal past; (6) Counsel failed to properly investigate the case, failed to get pertinent records, failed to interview and call material witnesses, failed to use discovery to get scientific studies, etc.; and (7) Counsel failed to preserve other grounds not presented on appeal because trial counsel handled the appeal in addition to the trial.

Other grounds alleged in the Petitioner's original habeas petition included: Violation of the Petitioner's right to confront his accusers because the trial court admitted testimonial hearsay evidence by Dr. George Wallace and Phyllis Hasty; and the Petitioner's Due Process rights were violated due to the use of jailhouse informants. The Petition and *Losh* Checklist were not

14

accompanied by a brief or any other pleading specifying specific facts to support some of the grounds.

The State did not respond to the 2005 habeas petition; the petition was denied by order entered on January 19, 2006, wherein the trial court noted that the lack of objections to some of the State's witnesses was not unreasonable or unprofessional, and that trial counsel did in fact object to testimony by Phyllis Hasty. The trial court noted that there was nothing in the trial record that substantiated the Petitioner's claim that his trial counsel failed to investigate, use discovery, get scientific studies, etc. because counsel did file sufficient motions for discovery and records. With regard to the Petitioner's claims of his trial counsels' failure to request cautionary jury instructions, the trial court found that no facts were alleged to support this ground and that requests of such instructions is within discretion of the trial counsel, and as such the trial court found no evidence of ineffective assistance of counsel on this ground. As for the Petitioner's claim that his right to confront his accusers was violated when the court admitted allegedly hearsay testimonies from Dr. Wallace and Hasty, the trial court concluded that such a ground constitutes ordinary trial error, and thus inappropriate for habeas proceedings. Further, because an appeal had been filed and was later refused by the West Virginia Supreme Court of Appeals, the trial court concluded the Petitioner's claim that the trial court improperly admitted hearsay evidence was without merit. Lastly, the trial court found that the use of jailhouse informants did not violate the Petitioner's due process rights.

On July 14, 2006, the Petitioner, by counsel, David C. Smith, Esq., filed an appeal (entitled "BARRY WHITE APPEAL") to the Supreme Court of Appeals of Judge John R. Frazier's order denying the his initial habeas petition. The Petitioner cited the following grounds for his appeal of his habeas petition: (1) that his right to confrontation was violated;

15

ineffective assistance of counsel; (2) that his right to jury trial and his right to due process violated; and (3) that the "potential sentence of 1,210 years to 2,580 years violated 8th Amendment prohibition of cruel and unusual punishment."

In his petition for appeal of his first habeas petition, the Petitioner outlined several segments of the trial transcript to illustrate how the children's biological father was accused of sexual misconduct with the children, and that the allegations against the natural father may have been "fused" into allegations against the Petitioner. The Petitioner claimed that the testimonies of Phyllis Hasty and Dr. Gregory Wallace were used to accuse the Petitioner of the sexual abuse. The testimony of Susan McQuaide had at least clarified in her interviews with the two girls that they indicated their natural father sexually abused them, not the Petitioner. Dr. Wallace testified that the older son, St.H., claimed the Petitioner had hit or punched him. When directly asked whether the Petitioner had touched his private parts, the boy claimed the Petitioner "punched" him on his private parts. However, Dr. Wallace testified that D.H. said the Petitioner touched her on her privates (which she referred to as "bird") with his "wiener."

The Petitioner argued that Phyllis Hasty provided far more detail and many more distinct acts of sexual misconduct with each of the four children, and that the Petitioner forced the children to perform sexual acts on each other.

The Petitioner also complained that the State used three jailhouse informants to testify about letters that he wrote to his then wife which included inflammatory information concerning the sexual abuse of the children.

The Petitioner argued that all the above testimonies constituted hearsay to convict him. The Petitioner stated that his trial counsel failed him by failing to preserve for him a fair and lawful trial; that they failed to preserve his constitutional rights: Specifically, the Petitioner

16

argued that his trial counsel failed him because they: (1) failed to object to the false and slanderous testimony of Phyllis Hasty concerning his alleged poisoning the children's Halloween candy; (2) failed to object to testimony that he had been convicted of manslaughter for killing his girlfriend and that he had served time for same; (3) failed to object to repeated prejudicial testimony that his wife beat and mistreated the children; and (4) put on psychological evidence in the Petitioner's case in chief that the Petitioner was an "anti-social alcoholic with a prison record" to collaborate the State's case.

First, the Petitioner complained that the introduction of the Phyllis Hasty and Dr. George Wallace testimonies violated the United States Supreme Court decision in *Washington v. Crawford*, 541 U.S. 36 (2004). Dr. Wallace did not treat the children, however he was an expert witness for the State. The record indicated that the children were in play therapy with Phyllis Hasty due to behavioral problems, not for sexual abuse allegations, because those were not known to Ms. Hasty at the time of the DHHR referral.[20] The statements allegedly made by the children to Ms. Hasty during therapy were in fact used for a prosecution of the Petitioner for sexual misconduct.[21]

Next, the Petitioner complained that his legal counsel were ineffective as a matter of law. The facts alleged to support this argument is that his counsel permitted testimony by Phyllis Hasty that the Petitioner poisoned the children's Halloween candy, according to one of the child victims, St.H. Ms. Hasty further testified that from the child's perspective, he believed that the Petitioner had poisoned his candy. The Petitioner argued that this testimony was irrelevant and

---

[20] Phyllis Hasty testified that she had been seeing the children off and on since 1994 (the two older children), through 2000-2001, then the other two younger children – which started with domestic violence allegations in the home and alleged threats by the Petitioner and the Petitioner's hitting M.H. with the car.
[21] The Court finds that *Crawford* would not apply to the Petitioner's case, as that decision was handed down after the Petitioner's trial. See, generally, FN 11, *State ex rel. Humphries v. McBride*, 220 W. Va. 362 (2007).

highly inflammatory and that his trial counsel did not object to it. Further, the Petitioner argued that his trial counsel failed to object to Phyllis Hasty's comments that St.H. was afraid of the Petitioner because he allegedly threatened to kill the children with a knife, because of hitting MH. with the car, and because of the alleged Halloween candy poisoning.

The Petitioner provided another instance of his ineffective trial counsel insofar as they successfully moved the trial court to suppress evidence of the Petitioner's prior voluntary manslaughter conviction, but then during cross-examination of a State witness, his trial counsel unwittingly elicited testimony about how the Petitioner killed his ex-girlfriend. Although his trial counsel immediately requested the trial court to strike that remark, trial counsel allowed testimony by the Petitioner's own witness concerning his prior manslaughter conviction and having served time. The Petitioner claimed that this was prejudicial to his defense and painted him in a very poor light.

The Petitioner provided another instance of ineffective assistance of trial counsel that included testimony by a State's witness concerning the misconduct of the Petitioner's wife, concerning the reasons why the State sought to remove the children from the home. Trial counsel failed to object to this prejudicial testimony as well.

Lastly, the Petitioner complained that his trial counsel was ineffective because they did not object to Phyllis Hasty testifying as to the credibility of the children. The Petitioner argued that this is reversible error, because as an expert, she was permitted to testify to the "ultimate question" concerning the children's allegations and is expressly prohibited under law.

The Petitioner argued that his rights to trial by jury and to due process of law were violated upon his conviction of 105 counts of sexual offenses on the paraphrased statements of the children to the effect that "it happened a lot" or "all the time." The prosecutor compounded

18

this violation by using her own discretion to determine how many counts with which to indict the Petitioner. Further, the Petitioner argued that these 105 counts could not be proved beyond a reasonable doubt, as not a single distinct act could be proved.

Finally, the Petitioner stated that the sentence he received was excessive and disproportionate to the crimes he was convicted of and in violation of the Eighth Amendment.

As outlined above, the State did not respond to the Petitioner's initial petition for writ of habeas corpus, and Judge John R. Frazier denied the petition without an omnibus hearing. The Petitioner filed a petition for appeal of the denial, and subsequently, the West Virginia Supreme Court of Appeals refused it on September 7, 2006.

### The Petitioner's Federal Petition for Habeas Corpus

On or about September 13, 2007, the Petitioner, by counsel, David C. Smith, Esq., filed for habeas relief in the United States District Court for the Southern District of West Virginia, case number 1:07-cv-00567. That matter is still pending, as the Petitioner, by counsel, has advised this Court that the federal district court has stayed proceedings until resolution of the Petitioner's State proceedings (this proceeding).

### III. TIMELINE OF MERCER COUNTY CIVIL ACTION NO. 10-C-294

On July 13, 2010, the Petitioner filed his addendum to his petition for writ of habeas corpus pursuant to W. Va. Code § 53-4A-1 as well as a motion for appointment of his current counsel, Thomas J. Gillooly, Esq., who had been appointed to the Petitioner's federal habeas matter. This Court granted the motion by order entered on July 14, 2010 and set the matter for a status hearing on July 21, 2010 at 1:15 p.m. After the status hearing, with the Petitioner having appeared via video teleconference, and the Respondent being represented by Kelli L.

19

Harshbarger, Esq., Assistant Prosecuting Attorney, this matter was scheduled for an omnibus hearing on April 25, 2011 at 11:00 a.m. by order entered on July 21, 2010. Subsequently, the Petitioner, by counsel, filed his motion to vacate or amend the previous order due to alleged inconsistencies in the final order pertaining to discovery and other pleadings filings deadlines discussed during the status hearing. An amended order was entered on August 10, 2010.

The omnibus hearing was rescheduled to May 4, 2011 at 10:00 a.m. due to a conflict in the Court's docket. On December 30, 2010, the Petitioner by counsel filed a motion for an order requiring the Respondent to admit or deny all the specific averments listed in the petition pursuant to Rule 8 of the West Virginia Rules of Civil Procedure. Additionally, the Petitioner, by counsel, filed his first set of interrogatories and requests for production of documents to the Respondent. On January 10, 2011, Scott A. Ash, Esq., as the Prosecuting Attorney for Mercer County, advised the Court via correspondence and copied to counsel for the Petitioner of a conflict in his office handling this case, subsequently, on January 11, 2011, the Court entered an order of disqualification of the Mercer County Prosecuting Attorney's Office with a request for appointment of a Special Prosecuting Attorney. On February 7, 2011, the Court appointed Sid Bell, Esq. as Special Prosecuting Attorney, and by order dated February 22, 2011, scheduled a status hearing for March 24, 2011 at 1:30 p.m. The Respondent, by counsel, Melissa D. Davis, Esq., Mr. Bell's designee, filed a motion to continue the status hearing, which was rescheduled for March 28, 2011 at 2:30 p.m. without objection by the Petitioner.

On May 2, 2011, the Petitioner moved to compel responses to its discovery requests, resulting in an order compelling discovery and amending the scheduling order, with the final omnibus hearing rescheduled for August 22, 2011 at 9:30 a.m. reserving the full day. On May 9, 2011, the Petitioner deposed former assistant prosecuting attorney, Deborah Garton, Esq., who

20

had prosecuted the Petitioner's underlying criminal case. On June 24, 2011, the Petitioner deposed Sgt. Melissa Clemons, of the West Virginia State Police, Princeton Detachment, who had travelled to Kansas to bring the Petitioner and his co-Defendant, Jennifer W         back to West Virginia to stand trial pursuant to a bench warrant issued for the pair for failure to appear at their arraignment on the underlying criminal offenses.

On July 20, 2011, the Petitioner filed his pre-hearing memorandum brief. The Respondent filed its own pre-hearing brief on September 21, 2011. By order entered on August 19, 2011, without objection by the Petitioner, the Court continued the omnibus hearing based on the Respondent's motion to continue same due to illness of counsel. The omnibus hearing was rescheduled to October 27, 2011 at 10:00 a.m., however, due to a latent conflict in the Court's docket, the hearing was again rescheduled to November 4, 2011.

During the hearing on November 4, 2011, the Petitioner called his former trial counsel, Susan E. F. Henderson, Esq. and Thomas L. Fuda, Esq. The parties agreed to submit the deposition testimonies of Deborah Garton, Esq. and Sgt. Melissa Clemons without having to recall them for the evidentiary hearing. At the close of the omnibus hearing, the Petitioner, by counsel, filed pursuant to this Court's request for simplification purposes, a revised *Losh* Checklist. Additionally, by order entered on November 22, 2011, this Court permitted the Petitioner to submit the deposition testimony of his expert witness, Bobby Miller, M.D. by November 30, 2011; the parties were permitted to submit post-hearing briefs, with responses thereto to be filed by January 31, 2012.

The Petitioner filed the video deposition transcript of his expert, Bobby Miller, M.D. on February 1, 2012. The deposition transcripts of Deborah Garton, Esq. and Sgt. Melissa Clemons were filed on February 13, 2012.

21

Accordingly, all the testimony and evidence in this matter have been filed and this case is ripe for decision. The briefs in this matter will be addressed in the order in which they were filed and the responses to same.

## IV. OVERVIEW OF PLEADINGS

### The Petitioner's Addendum to Petition for Writ of Habeas Corpus

In his Addendum, the Petitioner presented a seventy-four paragraph petition detailing the violations to his constitutional rights in the underlying criminal trial. His claims for relief included the following:

1. Violation of his right to confront his accusers under the Sixth and Fourteenth Amendments to the U.S. Constitution and Article III, Section 14 of the West Virginia Constitution, due to the fact that the child victims did not testify during the trial. This ground was supported by the fact that none of the children testified during the trial and that the Petitioner had no access to the children following his indictment. Additionally, the Petitioner claims that the trial court did not conduct its own interviews of the children.

2. Violation of his right to due process, under the Fourteenth Amendment of the U.S. Constitution and under Article III, Section 10 of the West Virginia Constitution, by the State depriving him of his right to confront his accusers. Not specifically listed as a factual allegation in support of this ground, but weaved throughout his addendum, the Petitioner argues that the trial court erred by failing to honor its gatekeeper role as suggested in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) when it permitted the State to use Phyllis Hasty, as a play therapist expert, to testify about the children's statements made to her during their therapy sessions. The Petitioner also argues that the Petitioner's trial counsel failed to consider the expert hearsay exception wherein the play therapist's testimony did not have the proper

22

foundation pursuant to *State v. Edward Charles L.*, 183 W. Va. 641 (1990), because there was no evidence establishing the children's motive in participating in therapy.

3.  Violation of those rights rendered the Petitioner's trial fundamentally unfair and further abrogated his rights to substantive due process.

4.  Ineffective assistance of court-appointed trial counsel during the trial and on direct appeal in violation of the Petitioner's Sixth and Fourteenth Amendment rights under the U.S. Constitution as well as Article III, Section 14 of the West Virginia Constitution. There were several factual allegations to support this ground, ranging from the Petitioner's trial counsel failing to object to the prosecutor's opening statement which provided unsworn testimony to be considered facts (pertaining to the sheer number of offenses charged against the Petitioner) to failing to object to the State's main witness, Phyllis Hasty, the children's play therapist, for her testimony concerning the credibility of the children's allegations against the Petitioner. The Petitioner also complains that his trial counsel failed to make the trial court conduct the six-part analysis required pursuant to *State v. Osakalumi*, 194 W. Va. 758 (1995) when the prosecution sought to introduce testimonial evidence of three jailhouse inmates concerning the Petitioner's letters to his wife, Jennifer W    , also a regional jail inmate. Additionally, not until November 2001, did the prosecution notice the Petitioner of its intent to use these witnesses, and further, failed to preserve the evidence of the letters themselves. The Petitioner argues although the record is unclear as to when the State had knowledge of the letters' existence, the State knew of the three female inmates sometime in the summer of 2001.

5.  Disproportionate sentence to the offenses involved violated the Petitioner's Eighth Amendment right against cruel and unusual punishment under the U.S. Constitution and Article III, Section 5 of the West Virginia Constitution. This ground was supported by the fact that the

Petitioner was convicted of 105 separate offenses of sexual assault – first degree and sexual abuse by a custodian. The Petitioner argues that there was insufficient evidence to support each alleged offense of sexual misconduct. The Petitioner was charged with multiple counts of sexual offenses in each calendar month from July 1999 through November 1999, with identical number of offenses for each month. No dates were specified. Moreover, the Petitioner was prejudiced because the trial court permitted the assistant prosecutor to use a chart as a demonstrative exhibit to help explain to the jury how the State came up with the numerous counts in the indictment.[22] Each sexual assault offense carried a sentence of fifteen to thirty five years imprisonment and each sexual abuse by a custodian offense carried a sentence of ten to twenty years. Judge John R. Frazier sentenced the Petitioner to a minimum 100 year sentence.

6.     The Petitioner includes all grounds set forth in previous appeal of his convictions which were refused by the West Virginia Supreme Court of Appeals.

## The Respondent's Answer to Petition

The Respondent begins by stating that since this is the Petitioner's second habeas petition and the first one was denied by the Court and the appeal thereof was refused by the Supreme Court of Appeals, this second petition is limited to only ineffective assistance of habeas counsel, newly discovered evidence, or a change in the law favorable to the Petitioner which may be applied retroactively. Further, any grounds raised in this second petition that were not directly appealed are deemed waived.

The Respondent denies that the expert testimony of play therapist, Phyllis Hasty, was improperly admitted because the Supreme Court of Appeals had already deemed her testimony compliant with the medical diagnosis or treatment exception under the hearsay rules in *State v.*

---

[22] The Petitioner conceded, however, that the general language in the indictment and the prosecution's proposed use of the chart as a demonstrative exhibit caused the trial court to grant his motion to dismiss fifteen counts of the indictment.

24

*Pettrey*, 209 W. Va. 449 (2001). Further, this issue was developed fully during pre-trial suppression hearings and properly admitted. Additionally, Ms. Hasty testified that the children's statements to her were made during the course of therapy sessions. The Respondent denies that Ms. Hasty vouched for the accuracy of the children's statements during trial.

The Respondent also denies that the admission of the three inmates' testimonies were improper. Further, the Respondent denies that the State ever had possession of the letters that were subject of the inmates' testimonies. The trial court conducted an *in camera* hearing and properly admitted the testimonies.

The Respondent contends that the evidence was sufficient to convict the Petitioner, as there was medical testimony concerning physical evidence of sexual abuse, evidence of improper sexual behaviors exhibited by the children and of course, the children's accusations made during therapy via Phyllis Hasty's testimony.

The Respondent also denies that the Petitioner received ineffective assistance of trial counsel, as the record indicated that they both objected to much of the State's proposed evidence during suppression hearings, including the trial testimony of Phyllis Hasty, the inmates' testimonies, and the flight evidence. Trial counsel objected to the numerous counts of the indictment which resulted in several being dismissed before trial. Further, trial counsel obtained their own expert witnesses to counter those of the State's, which brought out evidence of previous sexual abuse having been committed upon the eldest child, as well as the lack of credibility of the child victims. Indeed, the State's own witness, Phyllis Hasty, testified that the children's biological father had committed sexual abuse prior to the abuse committed by the Petitioner. In sum, the Respondent contends that the Petitioner herein is second-guessing his trial counsel's strategic decisions.

25

The Respondent argues that the children could not testify due to their tender ages, and that they were extremely fearful of the Petitioner. Also, the eldest child victim was low functioning. Pursuant to *Pettrey*, the children's testimony was not a prerequisite to the Petitioner's convictions. Moreover, the Petitioner received a legal sentence based on the jury's findings of guilt and appropriate for the nature of the offenses. Thus, the Respondent requests that the petition be denied.

### Petitioner's Pre-Hearing Memorandum Brief

The Petitioner highlighted the strongest points in support of his petition for habeas relief. His first argument concerns constitutional ineffective assistance of trial counsel. The Petitioner argues that his trial counsel should have objected properly to play therapist, Phyllis Hasty's testimony. He contends that nobody understood the ramifications of the Sixth Amendment Confrontation Clause with respect to Ms. Hasty's 'expert' testimony when the children had no idea for what purpose they had visits with her. The Petitioner argues that this testimony was admitted in contravention to Rule 803(4) of the West Virginia Rules of Evidence concerning the medical diagnosis or treatment hearsay exception. The Petitioner argued that only his co-Defendant's counsel seemed to understand the guidance provided by Professor Cleckley:

> The rationale behind this exception is that patients who are seeking medical help generally do not lie or exaggerate about their physical condition. Because proper medical treatment depends upon a reliable diagnosis, patients have a strong motivation to be truthful.[23]

In other words, there was no proper foundation for Ms. Hasty testifying as a witness of her therapy with the children in order to ensure reliable, truthful evidence.

Next, the Petitioner complains that his trial counsel should have objected to Phyllis Hasty's testimony going to the "ultimate issue" during trial. The pertinent question developed

---

[23] Franklin D. Cleckley, 2 *Handbook on Evidence for West Virginia Lawyers*, § 8-3(B)(4) [4th Ed. 2000].

during the trial between Assistant Prosecuting Attorney Deborah Garton and Ms. Hasty as follows:

> Q:    Okay, when she says - - now we're not experts and - - and you are - - when a child says he does it a lot, in this case we've charged one count per month per act whether it's anal sex, vaginal sex, oral sex, one count of each for July, one count of each for - - this is in reference to [D.H.] - - August, September, October, and November, based upon your conversations with the child would you say that that's an understatement?
>
> A:    Yes, probably, they - - I think it was probably[] that - - [S.G.] that stated that most of the time this would happen when - - when their mother would go to work and they would be left in - - in the care of Barry, and that - - so it happened a lot of nights.[24]

The Petitioner compares this testimony to the testimony that this Court found reversible error in *State of West Virginia, ex rel. Charles Jackson Akers v. David Ballard, Warden, Mount Olive Correctional Complex*, Mercer County Civil Action Number 09-C-199-OA.[25] In that case, this Court found that Ms. Hasty was permitted to testify to the ultimate issue:

> Q:        Would - if I said once a month would that be like out of the realm, that it happened once a month, based upon your treatment of her?
>
> A:        Based upon part of my treatment with her and the things she said I - I - **I truly believe** it happened many more times than once a month but, yes, it - **it would definitely be a true statement** that it happened once a month at least. (emphasis added)

Additionally, the Petitioner argues that his trial counsel did not object properly to the introduction of prison eyewitnesses to the alleged incriminating letters. He contends that the State mishandled the evidence – letters written by the Petitioner to his wife were seized and destroyed by jail officials. The Petitioner's trial counsel should have objected that the State failed to preserve the evidence and should not have been permitted to allow jailhouse snitches to

---

[24] Trial Transcript, December 4 – 7, 2001, at page 223 – 224.
[25] The civil action involved another inmate's petition for post-conviction habeas relief after having been convicted of numerous counts of sexual offenses involving a child victim.

27

testify as to the contents of the letters due to hearsay prohibitions; that failure was in violation of the law espoused by *State v. Osakalumi*, 194 W. Va. 758 (1995) in Syllabus Point 2:

> When the State had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either West Virginia Rule of Criminal Procedure or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the State's breach of its duty to preserve evidence, a trial court should consider (1) the degree of negligence or bad faith involved; (2) the importance of the missing evidence considering the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence produced at the trial to sustain the conviction.

The Petitioner contends that his trial counsel failed to call the trial court's attention to the State's failure to disclose the evidence of the letters, and further, that the State's failure to preserve the evidence was negligent insofar as the four-month delay of any serious investigation into this evidence. The nature of the confession contained in the letters was too important that no substitute was adequately available and had the Petitioner's trial counsel preserved this objection, the results would have likely been different.

Finally, the State failed to advise the defense of these letters until a week before trial, yet the State had four months to attempt to secure them.

### State's Pre-Hearing Brief

The Respondent responded to each of the "most compelling reasons" supporting the Petitioner's argument for habeas relief as outlined in his pre-hearing brief. First, the Respondent denies that play therapist, Phyllis Hasty, testified to the "ultimate issue" in the underlying criminal action. The Respondent also references the excerpts from the trial transcripts of both this matter and in the *Akers* matter, however, argues that the testimonies are distinguishable and

28

that Ms. Hasty only testified to the children's disclosures to her during therapy. The testimony was therefore admissible. In addition, the Respondent denies that the Petitioner's trial counsel failed to object to Ms. Hasty's testimony for being inadmissible. In fact, the Petitioner's trial counsel attempted to have Ms. Hasty's testimony barred from trial during a pre-trial suppression hearing, however, the trial court overruled any objections the Petitioner had at the time concerning the admissibility of the play therapist's testimony.

The Respondent also denies that the Petitioner's trial counsel failed to object to Phyllis Hasty's testimony due to its lack of foundation. Play therapy had already been recognized as an exception to the hearsay rule under medical diagnosis and treatment. Further, the evidence showed that the children were brought to Phyllis Hasty not for forensic purposes, but by the children's foster parents for treatment for behavioral issues. The foster parents had no idea what disclosures would have been made during therapy. The Respondent also argues that the children had no motive to lie during their therapy sessions with Ms. Hasty, it is irrelevant whether young children have any idea why they are at a medical providers office. Further, the Respondent suggests that any objections to the State for not having laid the foundation under the medical purpose exception to the hearsay rule would not have been successful. The Petitioner's co-Defendant's counsel made the argument, as the Petitioner recognizes here, however, the trial court overruled those objections as well and denied the co-Defendant's attempts to suppress Phyllis Hasty's testimony.

Next, the Respondent disagrees that the trial court abused its discretion in allowing the inmate testimonies pertaining to the Petitioner's letters to his wife. The evidence showed that as soon as the investigating officer met with the inmates and took their statements, these were immediately turned over to the Petitioner's defense team. The trial court conducted an *in camera*

29

hearing concerning the admissibility of the letters, and properly overruled the Petitioner's objections and arguments for suppressing the same. Further, there was no evidence that the State – the prosecutor, the investigating officer, or anyone connected with the Petitioner's criminal proceeding had possession of these letters, therefore, the fact that they were not turned over to the Petitioner was not a product of bad faith. The Petitioner's suggestion that the State had a duty to preserve those letters by citing to case law pertaining to exculpatory evidence, the facts here do not suggest that the State herein had any such duty to preserve incriminating letters that it had no possession of in the first place. The investigating officer attempted to secure those letters, but the regional jail authority interfered in those efforts.

The Petitioner's arguments for ineffective assistance of trial counsel, including those raised for the appeal, is second-guessing how things might have been done differently. These arguments do not rise to the level of ineffective assistance of counsel.

<u>The Petitioner's Checklist for Grounds for Post-Conviction Habeas Corpus Relief</u>

On November 4, 2011, at the close of the omnibus hearing, the Petitioner, by counsel, filed his revised *Losh* Checklist wherein he asserted the following grounds in support of his petition for writ of habeas corpus:

1. Statute under which conviction obtained is unconstitutional

2. Suppression of helpful evidence by prosecutor

3. Ineffective assistance of counsel

4. Refusal of continuance

5. Claims concerning use of informers to convict

6. Constitutional errors in evidentiary rulings

7. Instructions to the jury

30

8. Claims of prejudice by prosecutor

9. Sufficiency of evidence

10. Severer sentence than expected

11. Excessive sentence

All other grounds, forty-two of them, were expressly waived, each one having been initialed by the Petitioner and further signed by him and by his habeas counsel.

### The Petitioner's Post-Hearing Memorandum Brief

The Petitioner filed his post-omnibus hearing brief to buttress his arguments for the grounds alleged supporting his petition for writ of habeas corpus. The Petitioner argues that his expert, Dr. Bobby Miller, testified during a video deposition that cast significant doubt on Phyllis Hasty's trial testimony. In sum, the Petitioner's expert, Dr. Miller, opined that Ms. Hasty's methodology was improper, thus rendering any conclusions she had concerning the children's sexual abuse unreliable. Accordingly, the Petitioner's guilt is doubtful. Furthermore, the Petitioner argues that Dr. Miller testified about several areas available to attack Ms. Hasty's testimony, but none of those avenues were explored by the Petitioner's trial counsel.

Additionally, the Petitioner argues that his trial counsel testified in the omnibus hearing that they had no strategy or tactic in mind when they failed to raise an objection to Phyllis Hasty testifying to the credibility of the children, as espoused in Syllabus Point 7, *State v. Edward Charles L.*, 183 W. Va. 641 (1990): [A]n expert on child sexual abuse may not give an opinion as to whether he personally believes the child . . . ." Because his trial counsel failed to raise this objection, the outcome of the trial would have been different, because Phyllis Hasty's testimony was critical to the State's case when reviewed under the standard for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 693 (1984).

31

The Petitioner also argues that his trial counsel's failure to raise any *Osakalumi* objections with respect to the State's failure to produce the actual letters written by the Petitioner was another damaging instance of ineffective assistance of counsel. Because the letters amounted to confessions, the Petitioner's trial counsel should have tried to prevent the State from introducing testimonies of the co-Defendant's cell mates. During the omnibus hearing, the Petitioner's trial counsel both admitted that there was no strategy or logic to the failure to raise this objection. The Petitioner's trial counsel's omission or mistake in failing to raise *Osakalumi* was central to the State's case, and had they raised the proper objection, that the trial result would have been different.

Finally, the Petitioner highlights his trial counsel's ineffectiveness through the video deposition and report of his expert, forensic psychiatrist, Bobby Miller, M.D. Dr. Miller had criticisms of Ms. Phyllis Hasty's methodology and questioned the reliability of the disclosures the children made during their therapy sessions with her. The Petitioner argues that his trial counsel's failure to address the issues outlined by Dr. Miller shows that he was ineffectively represented at his trial that ultimately led to his conviction.

<u>The Respondent's Response to the Petitioner's Post-Hearing Brief</u>

The Respondent contends that the Petitioner received effective assistance of trial counsel. Further, any errors that might have been committed during their representation of the Petitioner do not rise to the level of ineffective assistance of counsel and also would not have changed the outcome of the case. The Respondent argues that in order to prove ineffectiveness of counsel, the Petitioner would have to prove "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v.*

32

*Washington*, 466 U.S. 668, 693 (1984). The Respondent argues that the Petitioner has not shown that his trial counsel's errors were unprofessional; he is merely second-guessing what happened during the criminal proceeding. The Petitioner's trial lawyers were very experienced and had testified that they provided the best defense possible for him.

The Petitioner's expert was retained to critique Ms. Phyllis Hasty's testimony. The Petitioner's expert received "very selected records" for his review in rendering his opinion. Further, the Petitioner's expert testified that his report and deposition testimony were not requirements of the profession. The Respondent argues that Ms. Hasty's testimony was weighed by the jury as any other witness's testimony.

### The Petitioner's Post-Hearing Memorandum Reply Brief

Simply put, the Petitioner replies that the Respondent has failed to directly challenge the issues the Petitioner raised in his briefs which amount to confessions of error.

### V.   LAW GOVERNING HABEAS CORPUS

*Habeas Corpus* is "a suit wherein probable cause therefore being shown, a writ is issued which challenges the right of one to hold another in custody or restraint." Syl. Pt. 1, *State ex rel. Crupe v. Yardley*, 213 W. Va. 335 (2003).[26] "The sole issue presented in a habeas corpus proceeding by a prisoner is whether he is restrained of his liberty by due process of law." *Id.* at Syl. Pt. 2. "A habeas corpus petition is not a substitute for a writ of error[27] in that ordinary trial error not involving constitutional violations will not be reviewed." *Id.* at Syl. Pt. 3.

In *State ex re. McCabe v. Seifert*, the West Virginia Supreme Court of Appeals delineated the circumstances under which a post-conviction habeas corpus hearing is available, as follows:

---

[26] See also, Syl. Pt. 4, *Click v. Click*, 98 W. Va. 419 (1925).

[27] A writ of error is a writ issued by an appellate court to the court of record where a case was tried, requiring that the record of the trial be sent to the appellate court for examination of alleged errors. Dictionary.com Unabridged (v 1.1) Random House, Inc. www.http://dictionary.reference.com/browse/writ of error>.

33

[1] Any person convicted of a crime and [2] incarcerated under sentence of imprisonment therefore who contends [3] that there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State, or both, or [4] that the court was without jurisdiction to impose the sentence, or [5] that the sentence exceeds the maximum authorized by law, or [6] that the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common-law or any statutory provision of this State, may, without paying a filing fee, file a petition for a writ of habeas corpus ad subjiciendum, and prosecute the same, seeking release from such illegal imprisonment, correction of the sentence, the setting aside of the plea, conviction and sentence, or other relief[.]

220 W. Va. 79 (2006); W. Va. Code § 53-4A-1(a).

Our post-conviction habeas corpus statute, W. Va. Code § 53-4A-1 *et seq.*, "clearly contemplates that a person who has been convicted of a crime is ordinarily entitled, as a matter of right, to only one post-conviction habeas corpus proceeding during which he must raise all grounds for relief which are known to him or which he could, with reasonable diligence, discover." Syl. Pt. 1, *Gibson v. Dale*, 173 W. Va. 681 (1984).[28]

"A prior omnibus habeas corpus hearing is res judicata as to all matters raised and as to all matters known or which with reasonable diligence could have been known; however an applicant may still petition the court on the following grounds: (1) ineffective assistance of counsel at the omnibus habeas corpus hearing; (2) newly discovered evidence; (3) or, a change in the law, favorable to the applicant, which may be applied retroactively." Syl. Pt. 4, *Losh v. McKenzie.*[29]

### Standard/Burden of Proof

---

[28] See also, *Losh v. McKenzie*, infra.

[29] On June 16, 2006, the West Virginia Supreme Court of Appeals held that a fourth (4th) ground for habeas relief may exist in cases involving testimony regarding serology evidence. Summarizing, the Supreme Court of Appeals held as follows:

A prisoner who was convicted between 1979 and 1999 and against whom a West Virginia State Police Crime serologist, other than a serologist previously found to have engaged in intentional misconduct, offered evidence may bring a petition for a writ of habeas corpus based on the serology evidence even if the prisoner brought a prior habeas corpus challenge to the same serology evidence and the challenge was finally adjudicated..

*In re Renewed Investigation of State Police Crime Laboratory, Serology Div.*, 219 W. Va. 408 (2006).

A habeas corpus proceeding is civil in nature. "The general standard of proof in civil cases is preponderance of the evidence." *Sharon B.W. v. George B.W.*, 203 W. Va. 300 (1998).

"Whether denying or granting a petition for a writ of habeas corpus, the circuit court must make adequate findings of facts and conclusions of law relating to each contention advanced by the petitioner, and to state the grounds upon which the matter was determined." *Coleman v. Painter*, 215 W. Va. 592 (2004).

## VI. TESTIMONIAL EVIDENCE

### The Omnibus Hearing[30]

The arguments during the hearing, and the testimonial evidence elicited from examination and cross-examination of the witnesses are discussed below. During the omnibus evidentiary hearing, the Petitioner focused on two major claims of ineffective assistance of counsel from his pre-hearing brief and addendum.

The first claim involves two components: (1) the Petitioner's trial counsel's failure to object at trial to Phyllis Hasty vouching for the children's credibility by testifying to the "ultimate issue" and (2) the Petitioner's trial counsel's failure to object to Phyllis Hasty's testimony concerning the State's failure to establish a proper foundation for the medical diagnosis or treatment hearsay exception.

The Petitioner examined his former trial counsel, Ms. Susan E. F. Henderson, Esq. initially by reviewing the transcript of the pre-trial suppression hearing involving an exchange between Mr. George Sitler, Esq., counsel for the Petitioner's co-Defendant, and former wife, Jennifer W.    , and the State's expert witness, Ms. Phyllis Hasty, the children's play therapist.

---

[30] The Court will address not only the testimonies taken from the Petitioner's trial counsel, Susan E. F. Henderson, Esq. and Thomas L. Fuda, Esq. during the hearing itself, but will also address the deposition transcripts submitted by the Petitioner after the evidentiary hearing as the parties agreed that the deposition testimonies of Ms. Deborah Garton, Esq., Sgt. Melissa Clemons, and Bobby Miller, M.D. were necessary components to the Petitioner's evidence submitted for this Court's review in support of his petition for post-conviction habeas relief.

Ms. Henderson recited the pertinent portion of the transcript with respect to the foundational requirement the Petitioner argues was not objected to before or at trial:

Mr. Sitler: Ok, so they knew that you were a nice lady in an office that they came to see. Did you tell them, or did you ask them if they knew why they were coming to your office?

Ms. Garton: Your Honor, objection. What the children knew, if they knew that they were going there to be evaluated for any purpose has no relevancy at all with her qualifications and her expertise. What the children knew?

*****

Mr. Sitler: Your Honor, under Ring v. Erickson, if the children did not know that they were there for the purpose of medical diagnosis and treatment, the statements may be held not to be admissible.

The Court: Of course, you're arguing in the face of Pettrey, it seems like to me at this point. But I'll let you develop it a little bit. Go ahead.

Ms. Hast[y]: On my first appointment, I do not ask that, I like to just get to know the child and see where they're coming from. [][31]

Ms. Henderson acknowledged on direct examination that in order for the hearsay exception to come in under medical treatment, the patient would have to understand why he or she is meeting with the medical provider. Ms. Henderson testified that she understood that Ms. Hasty's admitted testimony, as a play therapist, did not necessarily follow the foundation requirement concerning the medical diagnosis or treatment hearsay exception, agreeing with the Petitioner's understanding of Professor Cleckley's discussion of Rule 803(4) in the Handbook.[32] However, Ms. Henderson testified that the hearsay exception vis-à-vis play therapy is compromised due to the holding of the *Pettrey* case. Further, Ms. Henderson recognized that play therapy is for treatment purposes, however, usually the child would not necessarily know why he or she was in therapy in the first place.

---

[31] Transcript, August 1, 2001, at page 11, lines 11 – 24.
[32] *Infra.*

36

Ms. Henderson also testified that although she did not recall to objecting to Ms. Hasty's testimony during trial, she believed that she and her co-counsel had preserved the issue on appeal during the pretrial suppression hearing. Further, because the trial court had already ruled that Ms. Hasty's testimony would be admissible, she acknowledged that she may not have made another objection at trial on that issue because there was no anticipated testimony during the trial that was unexpected. When questioned by the Petitioner's habeas counsel as to Ms. Hasty's findings and testimony and how it met the test for reliability in order to go to the jury and why she had not attacked that testimony on that basis, Ms. Henderson responded that Ms. Hasty's testimony provided a unique situation because "this had been an issue that had been decided by actually our trial judge. Judge Frazier had been the judge in the Pettrey case so we were all familiar with what that said and how this was going to go at the time and as I said we did raise the issue in the appeal to the Supreme Court."[33]

With respect to the admission of the incriminating letters in trial, Ms. Henderson conceded that their primary objections were due to the late notice of receiving information about the letters and the additional State witnesses and that the contents of the letters were subject to the spousal privilege. Ms. Henderson testified that she could recall no tactical or strategic decision as to why she did not raise the *Osakalumi* issue.[34] Because the defense team was unaware of the existence of the letters and the inmates proposed testimonies until the eve of trial, Ms. Henderson conceded that she really did not have the time to consider all possible objections.

During cross-examination, Ms. Henderson testified that she had seven years trial experience before handling the Petitioner's case; her first criminal trial was a murder trial and she further stated that she and her co-counsel felt perfectly capable of handling the Petitioner's

[33] Omnibus Transcript, November 4, 2011, at page 17, lines 22 – 24 and at page 18, lines 1 – 2.
[34] Based on Syl. Pt. 2, *State v. Osakalumi*, 194 W. Va. 758 (1995).

37

case and that she and her co-counsel had prepared extensively for trial. Further, Ms. Henderson testified that she had brought up the issues concerning Ms. Hasty's admitted testimony as well as the absence of the letters on appeal.

In re-direct examination, however, Ms. Henderson conceded that neither the *Osakalumi* objection to the letters was raised on appeal, nor was any objection pertaining to Ms. Hasty's testimony vouching for the children's credibility.

Next, the Petitioner called Mr. Thomas L. Fuda, Esq. to testify, and he also had no recollection of whether any *Osakalumi* objection came up during preparation for trial and therefore could not state there was any tactical decision in failing to do so. He recalled that the jail had a policy of destroying letters between inmates and conceded that any *Osakalumi* argument could go both ways. When asked about his failure to object to Ms. Hasty's testimony as vouching for the credibility of the children's statements, Mr. Fuda recognized that an expert may not testify as to the "ultimate issue" in a case, but on cross examination opined that he notes the difference between Ms. Hasty's testimony from the *Charles Akers* case and the Petitioner's. However, Mr. Fuda conceded that Ms. Hasty's testimony that "it happened a lot" is rendering an opinion on the "ultimate issue."

### May 9, 2011 Deposition of Deborah Garton, Esq.

The Petitioner, by counsel, arranged for the deposition of Deborah Garton, the former assistant prosecuting attorney who handled the underlying criminal action. The main points addressed in Ms. Garton's deposition to support the Petitioner's asserted grounds for his petition for habeas relief were: (1) the State's handling of the letters evidence; (2) the application of *Osakalumi* with respect to the letters evidence; (3) Phyllis Hasty's testimony (as to going to the

38

ultimate issue and the foundational requirement in order for her testimony to come within the parameters of the medical treatment exception to the hearsay rules; and (4) the overview of the indictment and the chart used to explain the numerous counts to the jury.

Ms. Garton testified that she first became aware of a letter sent to the Mercer County Prosecutor's Office from an inmate at the Southern Regional Jail when William Sadler handed it to her.[35] She did not share the letter with the Petitioner's defense at that time because it had not become evidence.[36] Ms. Garton was uncertain as to when exactly she received the letter from the inmate concerning information about the Petitioner's criminal proceeding or when she instructed Trooper Melissa Clemons to interview the inmate for a statement. When statements were received from the inmates, they were turned over to the Petitioner's defense team.

On the subject of the letters written by the Petitioner, Ms. Garton testified that she understood that the regional jail had a policy of destroying such items because letters between inmates were considered contraband. Further, Ms. Garton disagreed with the Petitioner's habeas counsel that the regional jail authorities would be the "State" with respect to destruction of the letters, because to the regional jail the letters were "contraband" and not "evidence."[37] It appears from the deposition transcript, that the State, Ms. Garton via Trooper Clemons, first became aware of the possible existence of the letters during Trooper Clemons's interview with the jailhouse inmates on November 19, 2001.[38]

Ms. Garton also testified about the State's attempt to obtain possession of the letters, where the State would ask the jail authorities to initiate a "shakedown" in an attempt to seize

---

[35] At the time, William J. Sadler was the chief prosecuting attorney for Mercer County; he is now a circuit court judge for Mercer County.
[36] Deposition Transcript, May 9, 2011, at page 9, lines 1 – 3.
[37] Id. at page 26, lines 2 – 16.
[38] Deposition Exhibit 3, May 9, 2011.

something the State wanted.[39] However, the jail authorities advised the State that it would need a search warrant in order to seize the letters since they were in the Petitioner's possession or his wife's possession.[40] Further, Ms. Garton testified that she did not follow through with the search warrant because she speculated that the letters would probably have been destroyed by the time she could have a search warrant signed and executed; by then, the Petitioner and his wife would have been returned to their cells. Ms. Garton recalled that she requested, via Trooper Clemons, about the shakedown while the Petitioner and his wife were in Mercer County for a hearing. She testified that she was surprised that the jail authority wanted a search warrant in order to seize the letters because the State had "routine[ly]" obtained items it needed for criminal proceedings before through shakedowns.

Regarding the delay of when Ms. Garton was informed of a fellow inmate's information concerning the Petitioner's case and when she had Trooper Clemons follow up on that lead remains unclear. However, Ms. Garton testified that she provided the Petitioner's defense team the information as soon as she had it, and that they had known just as much about the existence of the letters at that point as she did.[41] Due to difficulties in recollection of the series of events, however, Ms. Garton is not certain as to when the State became aware of the regional jail's destruction of the letters or when the letters might have been destroyed.

With respect to the *Osakalumi* issue, Ms. Garton testified that in that case, she understood that the State had possession of a couch which it failed to turn over the defense, however, in the

---

[39] Id. at page 28, lines 15 – 25.
[40] Id., *passim.*
[41] Id. at page 36, lines 18 – 24.

40

Petitioner's case, it involves the letters, of which she contends the State never had possession.[42]

Further, Ms. Garton disagreed that *Osakalumi* has any application to the Petitioner's case.[43]

During direct examination of whether Phyllis Hasty testified to the ultimate question or to verify the truthfulness of the children's accusations, Ms. Garton testified that she would never have Ms. Hasty testify in that manner.[44] Ms. Garton testified that she had worked with Ms. Hasty as an expert witness for a number of years and it was well known by the pair that Ms. Hasty could not render an opinion based on the truthfulness of a child's statements. Ms. Garton also testified that she saw no difference in either Ms. Hasty testifying to how many times the child represented an act took place versus Ms. Hasty simply stating an act took place, and as such, Ms. Hasty is not testifying as to the child's credibility.[45] Additionally, Ms. Garton testified that she does not refer children to Ms. Hasty as an interviewer or as a means in an investigation; Ms. Hasty only plays with children and that children are referred to Ms. Hasty for therapy purposes only.[46]

With respect to laying the foundational requirement in order to have Ms. Hasty's expert testimony admitted before a jury, Ms. Garton testified that so long as play therapy was for purposes of treatment, then it qualified as a medical exception to hearsay.[47] Further, Ms. Garton was unconcerned about whether the child perceived the therapy for treatment purposes or even whether the child knew why he or she was seeing the therapist.[48] Though she could not recall whether the Petitioner's trial attorneys requested access to the children in the case, she testified that she would always object to such motions for orders from a court requiring a child be

---

[42] Id. at page 44, lines 23 – 25.
[43] Id at page 45, lines 24 – 25 and page 46, lines 1 – 2.
[44] Id at page 47, lines 24 – 25 and page 48, lines 1 – 5.
[45] Id. at pages 48 – 50.
[46] Id. at pages 51 – 53.
[47] Id. at page 68, lines 1 – 5.
[48] Id. at page 68, lines 11 – 19.

interviewed, or provide a statement because Ms. Garton believes that a court cannot order a complaining witness to speak to the defense.[49]

On the issue of the opening statement where Ms. Garton explained the counts in the indictment against the Petitioner by use of the chart, Ms. Garton testified that it was her practice to describe an indictment to the jury when it is "convoluted."[50] She also was unaware of ever being reversed on appeal for using a chart to describe a multi-count indictment in her opening statements during her years of practice as a prosecuting attorney.[51]

The Respondent did not ask Ms. Garton any questions during her deposition.

### June 24, 2011 Deposition of Sergeant Melissa Clemons[52]

During questioning of how Sgt. Clemons obtained the statements from the jailhouse informants housed with the Petitioner's then wife, Sgt. Clemons testified that she never interviewed the witnesses together, and that she interviewed them separately.[53] Sgt. Clemons recalled that Ms. Garton had instructed her to obtain statements from the inmates who had information concerning incriminating letters by the Petitioner. Sgt. Clemons further testified that she recalled that in order to obtain possession of the letters, she would have had to execute a search warrant, however, that pursuit was abandoned due to the fact that the Petitioner's co-Defendant was already aware that the State was interested in those letters and that her cell mates agreed to testify on behalf of the State.[54] Sgt. Clemons further testified that she could not recall when she first saw the letter written by one of the inmates that was sent to the Mercer County

---

[49] Id. at page 71, lines 1 – 15.
[50] Id. at page 57, lines 5 – 9.
[51] Id. at page 58.
[52] Again, in the interests of judicial economy, the Court is focusing on the content contained in the deposition transcripts that pertain the asserted grounds the Petitioner has alleged in support of his petition for habeas relief.
[53] Deposition Transcript, June 24, 2011, at page 13, lines 23 – 24.
[54] Id. at page 22, lines 17 – 25.

42

Prosecuting Attorney's office in July 2001.[55] Sgt. Clemons could not explain why four months had passed since the letter was received by the Mercer County Prosecuting Attorney's office before she obtained statements from the inmates.[56] She also testified that she went to get the inmates' statements as soon as she reasonably could get them.[57] Regarding the State's obligation to turn over evidence to a defendant, the testimony went as follows:

Q. Well, you understand that the state has an obligation to furnish evidence to a criminal defendant. Right?

A. Yes.

Q. And this was evidence in a criminal case, the letters. Correct?

A. If we have the evidence we have to furnish it. We didn't have it.

Q. A different agency of the state had it.

A. Well, not really. It was in her possession. From what I understand, it was in Jennifer's [co-Defendant of the Petitioner] possession.

Q. At the Southern Regional Jail.

A. Yes.

Q. So you don't consider that that puts it in the state's possession?

A. No, it's in Jennifer's possession.[58]

Sgt. Clemons could not recall when she received her instructions to obtain the letters or obtain statements from the inmates.

Counsel for the Respondent had no questions for Sgt. Clemons.

---

[55] Id. at page 23, lines 21 – 22.
[56] Id. at page 23, lines 24 – 25 and page 24, lines 1 – 2.
[57] Id. at page 24, lines 19 – 22.
[58] Id. at page 32, lines 23 – 25 and page 33, lines 1 – 15.

<u>November 28, 2011 Video Deposition of Bobby Miller, M.D.</u>

The Petitioner's last witness deposed in this matter was his retained expert, Dr. Miller, a psychiatrist, neuropsychiatrist, and forensic psychiatrist often employed by the circuit courts in Mercer County for his opinion concerning competency, criminal culpability and responsibility involving criminal defendants facing trial on a wide variety of offenses. Dr. Miller testified as to his opinion concerning the differences between clinical and forensic psychiatry. Essentially, the former concerns itself with the healing process, whereas the latter concerns itself with an investigation and lacks the physician-patient confidentiality.[59]

With respect to the matter herein, Dr. Miller testified that the Petitioner, by habeas counsel, requested that he conduct a "forensic psychiatry record review" of portions of record of the underlying criminal proceeding.[60] Specifically, Dr. Miller reviewed "some very selected and I think pertinent materials regarding what professionals said, either in reports or in their testimony" and to provide an opinion thereon.[61] After a thorough review of Dr. Estep's testimony concerning his forensic evaluation of the Petitioner on whether he exhibited criteria of pedophilia or exhibited a deviant sexual arousal for children under the age of fourteen, Dr. Miller testified that he found no fault with Dr. Estep's opinion from a professional standpoint.[62] Indeed, Dr. Miller testified that he had been trained in the same manner as Dr. Estep had been trained in

---

[59] Video Deposition Transcript, November 28, 2011, at page 14, lines 3 – 6.
[60] Id. at page 21, lines 7 – 8.
[61] Id. at page 21, lines 14 – 17. See also, Deposition Exhibit #1, the Forensic Psychiatry Record Review wherein Dr. Miller identified the following sources of information for his review:
1. Forensic Evaluation of Barry White Conducted by Dr. David Estep October 3, 2001
2. Psychological Evaluation Conducted by Dept. of Corrections February 21, 1997
3. Psychological Evaluation Conducted by Dept. of Corrections January 19, 1989
4. Psychological Evaluation Conducted by Dept. of Corrections July 26, 1990
5. Pre-Trial Analysis/Evaluation Conducted by W. Joseph Wyatt, PHD August 6, 2001
6. Trial testimony of Phyllis Hasty
7. Trial testimony of W. Joseph Wyatt, PhD
8. Trial testimony of Dr. David Estep
9. Trial testimony of Susan McQuaide, MSW
[62] Id. at page 27, lines 6 – 14.

44

conducting such evaluations.[63] Dr. Miller opined that Susan McQuaide's forensic interview "fell within . . . that reasonable paradigm of what would be a forensic interview for a child who's alleging sexual abuse."[64] With respect to Dr. Joseph Wyatt's opinion, Dr. Miller opined that Dr. Wyatt had an excellent reputation among the forensic interviewing community and that Dr. Wyatt intended to inform the trial court at the time that he could not provide a valid interview of the child victims herein due to D.H., a young girl of six, seven to seven and a half years, having been interviewed already so many times, coupled with her mild mental retardation, with attention deficit behavioral problems, among other variables. In short, Dr. Miller testified that he believed Dr. Wyatt's statement concerning the credibility of the child's statements were inconclusive based on those factors affecting the validity of a forensic interview.[65]

Dr. Miller also testified, after having reviewed the psychological evaluation reports on the Petitioner by the Division of Corrections, that none of those reports mentioned sexual issues or crimes of violence. Further, Dr. Miller testified that based on those reports, it appears that the Petitioner would have "popped out of a hole out of nowhere and did horrendous things for no apparent motive, despite many other evaluators saying it's unlikely."[66]

On the subject of Phyllis Hasty's testimony, Dr. Miller testified that he was "an advocate of play therapy", and thought it was a "good thing."[67] Dr. Miller further testified, "I don't think people consider play therapy to be a forensic technique. It's a therapeutic technique, and when somebody who is involved in play therapy starts to investigate accusations, then I think they should call it what it is and that is investigating forensic allegations."[68] Dr. Miller

---

[63] Id.
[64] Id. at page 32, lines 11 – 14.
[65] Id. at pages 35 – 38.
[66] Id. at page 39, lines 9 – 12.
[67] Id. at page 43, lines 15 – 16.
[68] Id., lines 17 – 22.

45

further opined that Ms. Hasty's testimony concerning the frequency of the acts of abuse involving the children was improper for a therapist or a forensic evaluator and that Ms. Hasty's testimony vouched for the accuracy of the indictment.[69] Dr. Miller was unsure as to how "faithful" Ms. Hasty's role as a therapist was in this context:

> I think what I said is I don't know, you know, it appears to me that - - I mean, based on my understanding of play therapy and knowledge of play therapy, that we went beyond that and entered very early into what appeared to be a preparation for a forensic experience, with the anticipation that she would take the stand and she would advocate for these children, this man would go to jail and she would - - she had an agenda early on.[70]

Dr. Miller also testified about twenty-five questions that he had concerning Ms. Hasty's testimony from a forensic psychiatry perspective. These twenty-five questions were listed in Dr. Miller's "Forensic Psychiatry Record Review" provided as an Exhibit to his video deposition. Dr. Miller also testified that these twenty-five questions would have been needed for an appropriate cross-examination of Ms. Hasty, which would have substantially changed her testimony.[71] With regards to Ms. Hasty's testimony, Dr. Miller was concerned, among many things, that she had no inquiry into the one-year delay from the time of the alleged abuse to the date of the disclosure of the alleged abuse; that she was unable to provide a motive for the Petitioner's abuse; that the children were supposedly happy and relaxed in therapy, however, horrendous events were disclosed; and that there were discrepancies in the children's capacities to disclose in therapy versus their capacities to testify in court.[72] In sum, Dr. Miller opined that "from a forensic psychiatry perspective, [Ms. Hasty's] testimony "didn't follow the standard as would be expected in the manner it was presented."[73]

---

[69] Id. at page 46, lines 22 – 23, *passim.*
[70] Id. at page 52, lines 6 – 14.
[71] Id. at page 58, lines 5 – 18.
[72] Id., *passim.*
[73] Id. at page 66, lines 22 – 24.

On cross examination, Dr. Miller testified that the twenty-five questions he had were ethical requirements.[74] Dr. Miller also addressed the difference between a forensic purpose versus the therapeutic purpose where in the former, he, as an evaluator, assumes the patient is lying, whereas in the latter, the patient's veracity is not doubted.[75] He also did not interview the Petitioner or any of the children in this matter.[76] Dr. Miller was not certain that the forensic interviewing technique pursued by Susan McQuaide was the standard at the time the children were interviewed before the Petitioner's criminal proceeding.[77] From the Division of Correction evaluations performed on the Petitioner, none of the criminal matters included the sexual abuse matters with which the Petitioner was subsequently charged.[78] The records Dr. Miller reviewed prior to rendering his opinion did not include information concerning the Petitioner's prior conviction of manslaughter.[79] Dr. Miller further testified on cross-examination that sex offenders sometimes do not exhibit signs of pedophilia, but might also have antisocial behavior as well as substance abuse problems.[80]

Dr. Miller also testified that Ms. Hasty, as a therapist, would have had a duty to disclose any sexual abuse disclosures made by the children during therapy.[81] Further, with regard to the children not exhibiting signs of trauma during or after play therapy, that D.H. had been sexually abused by her biological father prior to the Petitioner's abuse, and that it was a year until D.H. disclosed abuse, Dr. Miller has had experience where the abuse victims would have been "pre-sensitized" or "pre-abused" in cases involving sexual abuse among siblings or

---

[74] Id. at page 68, lines 7 – 11.
[75] Id. at page 68, lines 12 – 22.
[76] Id. at page 69, lines 13 – 19.
[77] Id. at page 75, lines 2 – 9.
[78] Id. at page 76, lines 21 – 24 and at page 77, lines 1 – 2.
[79] Id. at page 77, lines 3 – 9.
[80] Id. at page 78 – 79.
[81] Id. at page 77, lines 19 – 24; at page 78, lines 1 – 5.

where there had been a prior abuser and the child reacts stronger to the second abuser due to the perception that the abuse had been extended.[82]

## VII.   DISCUSSION

The Court, having reviewed and considered the Petition, the briefs filed on behalf of the parties, the court files, the transcripts of the trial and pretrial proceedings, the deposition transcripts, the arguments of counsel, the testimonies from the omnibus hearing, and the pertinent legal authorities, does hereby **DENY** the Petitioner's Petition for habeas corpus relief. In support of this decision, the Court makes the following **FINDINGS OF FACT** and **CONCLUSIONS OF LAW**:

### A.   Statute under which conviction obtained is unconstitutional[83]

There were no facts alleged in any of the pleadings filed in this matter, and there was no evidence provided to this Court in support of this asserted ground. Accordingly, the Court finds that the Petitioner did not allege with any particularity constitutional defects in the charging statute indictment before his trial or on appeal and therefore **FINDS** and **CONCLUDES** this ground without merit.

### B.   Suppression of helpful evidence by prosecutor[84]

There were no facts alleged in any of the pleadings filed in this matter, and there was no testimonial evidence provided to this Court in support of this asserted ground. Accordingly, the Court finds that the Petitioner did not allege with any particularity that the prosecution suppressed any helpful evidence to the Petitioner and therefore **FINDS** and

---

[82] Id. at page 80 – 82.

[83] For purposes of simplicity, this Court reviewed each ground as alleged by the Petitioner in his revised *Losh* Checklist filed on November 4, 2011 with respect to the evidence supporting each of the asserted grounds.

[84] Although there were no specific allegations that the State had suppressed "helpful" evidence, the Court is mindful that the Petitioner had alleged that the State failed to produce the incriminating letters that amounted to confessions in violation of the Supreme Court of Appeals holding in *State v. Osakalumi*, infra. However, because this argument was linked to another asserted ground, "Claims concerning use of informers to convict", the Court addresses the lack of physical evidence (the letters) under that ground.

48

**CONCLUDES** this ground without merit.

## C. Ineffective assistance of counsel

The Petitioner cites numerous instances of ineffective assistance of his trial counsel: (1) that trial counsel failed to properly object to the State's failure to produce the incriminating letters the Petitioner allegedly wrote to his then wife while they were incarcerated at Southern Regional Jail[85]; (2) that trial counsel failed to object properly to the State's introduction of the testimonies of the three jailhouse inmates concerning the contents of the letters; (3) that trial counsel failed to properly object to play therapist, Phyllis Hasty, hearsay testimony without having laid the proper foundation for same; (4) that trial counsel failed to object to play therapist, Phyllis Hasty, from providing her opinion as to the credibility of the child victims' out of court statements; (5) that trial counsel failed to make any effort exploring the prior sexual abuse suffered by the child victims by their biological father; (6) that trial counsel failed to object to the assistant prosecuting attorney's opening statement which amounted to unsworn testimony concerning purported facts; and (7) that trial counsel failed to obtain additional psychological and psychiatric evidence, or to present expert testimony to counter that presented by the State's witnesses.[86]

---

[85] For easy reference, the Court will refer to this 'sub-ground' as the "*Osakalumi* Objection", the remaining sub-grounds will have their own reference headings in the respective order of the sub-grounds listed: "Jailhouse Informants Objection" ; "Phyllis Hasty Foundation"; "Phyllis Hasty Testifying to the 'Ultimate Issue'"; "Prior Sexual Abuse of the Children"; "State's Opening Statement"; and "Additional Psychiatric Evidence to Assist Defense."

[86] The Petitioner also incorporates the alleged grounds for ineffective assistance of trial counsel as alleged in his previous petition for writ of habeas corpus as provided in Mercer County Civil Action No. 05-C-796-F which included: failure to object to the testimonies of Dr. Wallace and Phyllis Hasty; allowing Phyllis Hasty testimony concerning the Petitioner's allegedly poisoning Halloween candy; eliciting testimony regarding the Petitioner's prior conviction for manslaughter and then failing to request a cautionary instruction; eliciting testimony regarding the Petitioner's co-Defendant's conduct with the children – the termination of her parental rights and failing to request cautionary instructions on those issues; and failure to properly investigate or conduct discovery.

49

<u>*Osakalumi*</u> <u>Objection</u>

The Petitioner claims that his trial counsel were ineffective for failing to raise an objection based on *State v. Osakalumi* where the State failed to produce and disclose to the Petitioner's defense team the actual letters he allegedly wrote to his then wife, Jennifer W       , while they were both incarcerated at Southern Regional Jail. The Petitioner argues that his trial counsel raised objection based on hearsay and the marital privilege, however, they failed to raise a stronger objection where the State had a duty to disclose to the Petitioner the actual letters.

The Court reviewed at length the *Osakalumi* case and its application in the Petitioner's case, and opines that its application is questionable: That case dealt with *exculpatory* evidence – and the State's duty to preserve such evidence for examination by a defendant when same was necessary in prosecuting a defendant. The purported trajectory of the bullet through the couch was crucial to the State's expert's (Dr. Irvin Sopher) determination that the manner of death of the victim was homicide, not suicide (the defendant therein had argued that the victim killed himself by playing Russian Roulette, and he and his companions panicked and dumped the body in the woods). The couch was never preserved by the State, although it had several opportunities to preserve it and for reasons unknown, never took decent photographs of the couch when law enforcement first examined it, and further, law enforcement never recorded the dimensions of the couch). The couch began to smell terribly, so law enforcement, with the Mercer County Prosecutor's blessing, disposed of it.

In this case, the Petitioner complains that his due process rights were violated when the State failed to preserve the *incriminating* letters he wrote to his then wife while the both of them were incarcerated. *Osakalumi* held that the negligent failure of the police to preserve the couch in which the fatal bullet was lodged and the police's failure to photograph the couch properly

before its destruction prevented the defendant therein from fully and fairly examining expert testimony regarding the trajectory of the bullet, and, thus, the defendant was denied a fair trial.

In *State v. Hatfield*, 169 W. Va. 191 (1982), the West Virginia Supreme Court of Appeals recognized that due process requires prosecutors to reveal to a criminal defendant all potentially exculpatory evidence in accordance with the State Constitution. *Osakalumi* examined the process a trial court must follow when the situation arises where the State "had or should have had evidence requested by a criminal defendant but the evidence no longer exists when the defendant seeks its production, a trial court must determine (1) whether the requested material, if in the possession of the State at the time of the defendant's request for it, would have been subject to disclosure under either West Virginia rule of Criminal Procedure 16 or case law; (2) whether the State had a duty to preserve the material; and (3) if the State did have a duty to preserve the material, whether the duty was breached and what consequences should flow from the breach." *Id.* at 766.

The Court FINDS that *Osakalumi* does not apply in this matter for several reasons: first, the evidence destroyed was not exculpatory evidence. The letters written by the Petitioner to his then wife were found to be exceptions to the hearsay exception because they contained admissions to the crimes for which the Petitioner had been prosecuted. Further, the evidence in *Osakalumi* was part of an ongoing police investigation which ultimately became an important aspect of the defendant's criminal trial. In the Petitioner's criminal trial, the letters were not part of the criminal investigation and no law enforcement officer had knowledge of the letters. The Mercer County Prosecutor's office had no knowledge of the letters until after the investigating officer had taken statements from the Petitioner's wife's cell mates. The record shows that the the Prosecutor's office was not informed of the existence of the letters from the cell-mates'

51

correspondence; there was simply <u>no mention of these letters within the letters</u> to the Prosecuting Attorney. When Sgt. Clemons went to the regional jail to investigate about the letters, she was advised by regional jail authorities that the letters had been destroyed pursuant to jail policy of destroying contraband, which evidently, the inter-inmate letters were deemed to be.

The Court will not go so far as to consider the authorities at the regional jail the "State" with regard to the State's duty to preserve evidence in a criminal investigation and subsequent proceeding. West Virginia Code § 31-20-27a provides that regional jail employees are not law enforcement officers. Pursuant to W. Va. Code § 31-20-1 et seq., it is clear that the Legislature intended for the Regional Jail and Correctional Facility Authority to be an entity separate and apart from the offices of prosecuting attorneys. Moreover, a thorough review of W. Va. Code § 31-20-5 includes the powers and duties of said authority, however, preserving evidence is not one of them. Interestingly enough, the authority's duties concerning monitoring of phone calls of inmates, where such phone calls are recorded, there is no requirement that said phone call recordings be turned over to law enforcement during investigations. As an extension of that, neither would confiscated letters, unless there was a proper court order requiring that the evidence shall be turned over to law enforcement. Based on the above, it is clear that the regional jail was never a party to the ongoing investigation concerning the Petitioner's sexual abuse charges, and accordingly, the regional jail had no duty to preserve evidence in the Petitioner's criminal proceeding. Presumably, the regional jail authorities had no idea of the importance of the letters when they were confiscated, if indeed they had been confiscated, as the record is unclear as to what exactly happened to the letters. Nevertheless, it is clear to the Court that the State, being the Office of the Mercer County Prosecuting Attorney as well as the West

52

Virginia State Police or any other investigative arm of the Mercer County Prosecuting Attorney did not have possession of the letters.

Accordingly, due to the irrelevance of *Osakalumi* to the loss of the letters evidence herein, the Court FINDS that the Petitioner's trial counsel were not ineffective due to their failure to raise this particular challenge to the loss of the evidence.

### Jailhouse Informants Objection

As another incidence of the Petitioner's claim of ineffective assistance of trial counsel, the Petitioner complains that his counsel failed to properly object to the testimonies by his then-wife's cell-mates. The record, however, showed that the Petitioner's trial counsel did in fact raise several objections to the State's request to use three jailhouse informants' testimonies concerning the content of the letters, and those objections were duly overruled. Counsel objected to the testimonies because of the spousal privilege. The trial court found that the privilege did not apply because the Petitioner used his mother as an intermediary to forward the letters to his wife, as it was against jail rules for inmates to write to each other directly. The Petitioner destroyed the privilege, and the trial court properly ruled accordingly. Counsel objected to the testimonies on the premise that it was hearsay evidence, however, the trial court properly found that the statements in the letters, as remembered by the three jailhouse informants, were statements against interest, and also qualified as exceptions to the hearsay prohibition under the catchall provision. The three jailhouse informants knew the letters were written by the Petitioner because the Petitioner's then wife, Jennifer W]     told them. Therefore, identification and/or authentication of the letters were not issues. The trial court made the appropriate rulings based upon the Petitioner's objections to same at the time. There is nothing in the record that indicates that the Petitioner's trial counsel were ineffective with respect to their objections to the

53

testimonies of the jailhouse informants. Accordingly, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this claim by a preponderance of the evidence.

## Phyllis Hasty Foundation

Another sub-ground for ineffective assistance of trial counsel concerns itself with the Petitioner's contention that his trial counsel failed to object to the testimony of Phyllis Hasty where no foundation had been laid allowing for such testimony. The Petitioner argues that not only his counsel, but also the trial court itself failed to honor its gatekeeper role in ensuring that testimony given under the medical diagnosis or treatment provision was not given proper effect. In other words, the Petitioner argues that Phyllis Hasty was able to testify about the children's statements made to her during their play therapy sessions with her, without having set the proper foundation as to whether the children knew why they were seeing Ms. Hasty in the first place.

After a review of the transcripts in the underlying criminal proceeding as well as the testimony given during the omnibus hearing, this Court does not find that the Petitioner's counsel were ineffective on this sub-ground. The Petitioner provides the excerpt of the transcript containing the dialogue between his then co-Defendant's counsel, the witness Ms. Hasty, and the trial court wherein the co-Defendant's counsel attempted to object to Ms. Hasty's testimony as being without the proper foundation. The trial court was not persuaded by the co-Defendant's counsel's argument. The Petitioner has based his argument against the improper foundation for Ms. Hasty's testimony on foreign case law mentioned in Justice Starcher's concurring opinion in *State v. Pettrey*, 209 W. Va. 449 (2001). However, as stated by the trial court at the time of the Petitioner's suppression hearing, recognized that the West Virginia Supreme Court of Appeals had already recognized Ms. Hasty's play therapy, and the statements given to her by her children patients during those therapy sessions, as admissible evidence in sexual abuse cases.

54

The Petitioner's argument lacks merit; the trial record showed that the two older children were taken to Phyllis Hasty for therapy purposes by the foster parents. The children were acting out in inappropriate ways that alarmed the parents who sought help from the play therapist. Further, in spite of Professor Cleckley's Handbook, the Supreme Court of Appeals already addressed this issue in *Pettrey*, wherein play therapy was given the recognition as a medical diagnosis and treatment, and further recognized such therapists as "experts" and therefore as such, are within the hearsay exception.

At pretrial hearings the State demonstrated that the victims were frightened of the Petitioner. Additionally, the Petitioner recognized that Mr. George Sitler, Esq., the public defender who represented the Petitioner's then wife, Jennifer W        , "demonstrated that he understood the hearsay exception supporting Rule 803(4) 'Statements for purposes of medical diagnosis or treatment'" however, the trial court had overruled the objection. Therefore, it begs the question, had it not been for trial counsel's errors, would the result have been different? This Court FINDS that it would not. Accordingly, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this sub-claim of ineffective assistance of counsel by a preponderance of the evidence.

<u>Phyllis Hasty Testifying to the "Ultimate Issue"</u>

The Petitioner has painstakingly outlined the comparisons between the trial testimonies given by Phyllis Hasty in his trial and in the trial concerning Charles Akers. The Court has reviewed same thoroughly and simply cannot agree with the Petitioner's argument that Ms. Hasty testified as to the credibility of the children. There is a major difference between Ms. Hasty's trial testimony in the Petitioner's case and in the other criminal matter. Further, during the omnibus hearing, even though neither trial counsel objected to the testimony as cited by the

55

Petitioner in his claim that she had vouched for the children's credibility, the Petitioner's counsel were well aware of what Ms. Hasty's testimony would be. In other words, they were not surprised by her testimony and were amply prepared to cross examine her because everyone knew what she was going to say during the trial.

This Court has reviewed the trial testimony at length and cannot agree with the Petitioner that Ms. Hasty was permitted to testify to the "ultimate issue" without objection. This Court FINDS that Ms. Hasty only testified as to what the children disclosed to her during their therapy sessions, testimonial evidence that has long been recognized as admissible evidence pursuant to *Pettrey*. Accordingly, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this sub-claim of ineffective assistance of counsel by a preponderance of the evidence.

Prior Sexual Abuse of the Children

The next sub-ground of ineffective assistance of trial counsel involves their failing to bring out the sexual abuse suffered by the children prior to the abuse they allegedly suffered at the hands of the Petitioner. This sub-ground also lacks merit. The trial record clearly shows that this was indeed addressed during the trial. Even Ms. Phyllis Hasty testified on direct that there had been allegations of sexual abuse of the oldest child by her biological father.[87] Moreover, the Child Protective Services worker, Ms. Michelle Massaroni, on cross-examination by the Petitioner's counsel, had mentioned that she had been aware of the allegations of sexual abuse against the children's biological father.[88] During the direct examination of Dr. Joseph Wyatt, a defense witness, he also testified that the eldest child disclosed sexual abuse by her biological father and even denied that the Petitioner had abused her based on his review of several

---

[87] See Trial Transcript, December 4 – 7, 2001, at pages 203 – 276.
[88] Id. at page 297, lines 10 – 12.

56

interviews performed by another practitioner with the child.[89] Interestingly, Dr. Wyatt noted that the eldest child's disclosures were "consistent" but then the story had changed, where the Petitioner became the target of the allegations of sexual abuse.[90] Susan McQuaide, who also testified on behalf of the Petitioner, also advised during direct examination that she was initially contacted to interview the children based on allegations of sexual abuse by the children's biological father.[91] Indeed, on direct, Ms. McQuaide testified that the only disclosure of sexual abuse made to her during the interview was perpetrated by the children's natural father.[92]

Evidently, this became a credibility determination where the jury found that the Petitioner also engaged in sexual abuse of the children, despite their history with their biological father. Accordingly, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this sub-claim of ineffective assistance of counsel by failing to address the child's (children's) prior sexual abuse by their biological father by a preponderance of the evidence.

### State's Opening Statements

The State began its opening statements with an overview of the multiple-count indictment. Although the parties had discussed the use of the chart the State intended to use as a demonstrative aid to help the jury understand the indictment, the State was able to do so with the blessing of the Petitioner's defense team. Of importance here, the State's own chart assisted the Petitioner in his motions to have several counts of the indictment dismissed prior to trial. Further, although the Petitioner's trial counsel did not object during the State's opening statements, the record does not indicate that the Petitioner suffered any additional prejudice by the assistant prosecuting attorney's explanation of the complex indictment. Accordingly, the

---

[89] Id. at page 339, lines 2 – 9.
[90] Id.
[91] Id. at page 489, lines 8 – 15.
[92] Id., lines 21 – 24.

57

Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this sub-claim of ineffective assistance of counsel by a preponderance of the evidence.

Additional Psychiatric Evidence to Assist Defense

This sub-ground lacks merit. The record is clear that the Petitioner did offer in his defense psychiatric and/or psychological evidence and his own expert to counter those of the State. The Petitioner had undergone his own forensic interview with Dr. Larry David Estep, Jr. The purpose of his trial testimony was to provide the jury with evidence of the Petitioner's character, insofar as he was not a pedophile or sexual offender with respect to children. Moreover, Dr. Estep testified that the particular psychological testing that he performed upon the Petitioner was fairly accurate, even comparing it to blood tests for diabetes.[93]

Although this sub-ground was not addressed during the omnibus hearing, the trial record shows that the children had been interviewed multiple times by several experts. Indeed, the Petitioner's own retained expert for purposes of this omnibus proceeding, Dr. Bobby Miller, opined that any further examinations of the children would not bear fruit because of having been 'over-examined' for lack of a better word. Even the Petitioner's own expert, Dr. Wyatt testified during the trial that the oldest child had been interviewed "probably several dozen" times which causes a child to change his or her story due to the repeated interviews.[94]

The Petitioner chose to introduce evidence that he did not fit the profile of a pedophile or sexual deviant, as a means to counter any evidence of lustful disposition towards children. Each expert's opinion or testimony had been weighed by the jury. The Petitioner's defense team did not have access to the children, however, there is no indication in the record that additional interviews of the children were requested by the defense. Based on the Petitioner's own

---

[93] Id. at page 547, lines 15 – 22.
[94] Id. at page 337, lines 6 – 12.

arguments in this proceeding, it does not appear that it would have made any difference, and perhaps might have created more harm than good. Indeed, it is unlikely what additional psychiatric or psychological evidence could have been introduced on behalf of the Petitioner to further bolster his defense. It is also more likely than not, that it would not have made much of, if any, difference at the conclusion of the trial.

Accordingly, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this sub-claim of ineffective assistance of counsel by a preponderance of the evidence.

## D. Refusal of Continuance

The Petitioner's claim that he had been prejudiced at trial due to a 'refusal of continuance' is also without merit; although the record below indicated that his trial counsel were perturbed by being noticed of the cell-mate testimonies so soon before trial, providing them little chance to prepare for same, the record also shows that trial counsel objected to the sudden thrust of additional State witnesses, HOWEVER, trial counsel testified during the omnibus hearing that they had felt prepared for the trial. Further, and most importantly, the trial and even the appellate record is devoid of any mention of a defense motion to continue. Therefore, there was no motion before the trial court to grant or deny. Accordingly, there is no record or preservation of this issue before this Court in order to render a decision upon same. In sum, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this claim by a preponderance of the evidence.

## E. Claims Concerning Use of Informers to Convict

Under this ground, the Petitioner complains that the State used inappropriate testimonial evidence elicited by his ex-wife's cell-mates. Again, the record showed a thorough pre-trial motions hearing on the Petitioner's motion to suppress the cell-mates' testimonies, however,

59

unsuccessfully. Additionally, the Petitioner appealed that issue before the West Virginia Supreme Court of Appeals to no avail. Indeed, the trial court made an appropriate ruling based upon controlling case law and the applicable rules of evidence and properly admitted the testimonies. Accordingly, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this claim by a preponderance of the evidence.

## F.    Constitutional errors in evidentiary rulings

Throughout the numerous briefs filed on behalf of the parties in this proceeding, the Petitioner has touched upon this claim in various other claims and/or sub-grounds of specific claims. Nevertheless, having reviewed the Petitioner's contentions of constitutional errors, including ineffective assistance of counsel, introduction of hearsay testimonies pertaining to allegedly lost or destroyed incriminating letters, this Court cannot agree with the Petitioner that there had been constitutional errors in the evidentiary rulings by the trial court.

The Petitioner's counsel preserved his objections to the overall indictment, which included numerous offenses with non-specific dates, to which the Petitioner unsuccessfully moved to have dismissed due to insufficient notice of the alleged crimes he had been charged with in order to mount a defense. The trial court conducted pre-trial hearings on this subject and after the close of the State's case-in-chief, concluded that there was prima facie evidence to support the numerous counts. Evidently, the jury found that there had been proof beyond a reasonable doubt for each of the remaining counts in the indictment as well.

Indeed, the Petitioner complains that his counsel failed to object to Ms. Hasty's testimony on the basis of violation of his 6th Amendment right to confront his accusers, as the Petitioner had no access to the young victims in this case. The trial court permitted the testimony of Phyllis Hasty in accordance with the Supreme Court of Appeals ruling on same. The trial court

60

conducted pre-trial suppression hearings on the matter and concluded, pursuant to law, that the testimony would be admissible because the disclosures had been made in a therapeutic setting. Although the Petitioner complains that he was unable to access the children and therefore was deprived of his constitutional right to confront his accusers, the trial transcript reveals that the children were frightened of the Petitioner and would have been unable to testify. This Confrontation Clause issue had been previously addressed in *State v. Pettrey*, 209 W. Va. 449 (2001) and again in *State v. Shrewsbury*, 213 W. Va. 327 (2003)[95] where child victims of sexual offenses did not testify at trial, but therapists and other persons were allowed to testify about the victim's disclosures.

On the failure of the State to produce the incriminating letters and substitution therefore of the three jailhouse inmates, this Court has already discussed that issue at length above and found no error in the trial court's admission of those testimonies and overruling the Petitioner's objections to same.

On the issue of the alleged error in admitting the evidence of the Petitioner's flight, the trial court reviewed the applicable case law and determined that the evidence of the Petitioner's flight was admissible at trial as to evidence of the Petitioner's guilty conscience or knowledge. Pursuant to *State v. Payne*, 167 W. Va. 252 (1981), the trial court conducted a pre-trial hearing on the matter, and after a review of the testimonial evidence, found that the Petitioner was aware of his being a suspect at the time he fled.[96] The Petitioner was aware of the indictment, as it had been published in the local paper and there was evidence that the Petitioner had fled after docket

---

[95] The *Shrewsbury* Court modified its previous holding in *State v. James Edward S.*, 184 W.Va. 408 (1990), to comply with the United States Supreme Court's subsequent pronouncements regarding the application of its decision in *Ohio v. Roberts*, 448 U.S. 56 (1980), to hold that the unavailability prong of the Confrontation Clause inquiry required by syllabus point one of *James Edward S.* is only invoked when the challenged extrajudicial statements were made in a prior judicial proceeding. There clearly were no statements from a prior judicial proceeding in the case *sub judice*, or in the cases concerning the implication of 6th Amendment right violations as detailed above.
[96] Id. at page 159, lines 21 – 22. The trial court also stated on the record that it had reviewed *State v. Meade*, 196 W. Va. 551 (1996) to assist in its decision to permit the limited evidence of the Petitioner's flight.

day.[97] Although the Petitioner put on a single witness during the suppression hearing, the trial court found that the testimony provided no explanation for the flight. There was indication that the Petitioner and his wife left to stay with an uncle, but the evidence showed there was no uncle living in the area within three hundred miles.[98] In sum, the trial court did not find any credible testimony other than the Petitioner simply left the jurisdiction and that under the circumstances, there was enough evidence to go to the jury that the Petitioner sought to avoid prosecution and that the probative value of the flight evidence outweighed the prejudicial effect.[99]

After having made the ruling on the issue of flight evidence, the trial court further warned the State that it would not be permitted to "overdo this" and can only mention that the Petitioner had left, was arrested, and brought back.[100] The trial transcript reveals that the State brought out the testimonial evidence concerning the Petitioner's flight during its direct examination of Trooper Melissa Clemons, the arresting officer. During the examination, the trial court interrupted and further informed the jury:

> Let [] me interrupt and instruct the jury that this evidence of alleged flight by the Defendant is competent along with other facts and circumstances on the Defendant's guilt, but the jury should consider any evidence of flight with caution since evidence - - such evidence only has a slight tendency to prove guilt. The jury is further instructed that the farther away the flight is from the time of the commission of the alleged offense the less weight it will be entitled, and the circumstances should be cautiously considered since flight may be attributed to a number of reasons other than consciousness of guilt.[101]

The Court notes that there were no objections to the testimony by the Petitioner. Further, in the State's closing argument, there was only a brief mention that the Petitioner had left the area.

---

[97] Id. at page 160, lines 1 – 2.
[98] Id., lines 10 – 14.
[99] Id., lines 15 – 21.
[100] Id. at page 160, lines 22 – 24 and at page 161, lines 11 – 12.
[101] Id. at page 317, lines 6 – 13.

Because there had been ample hearings concerning the evidence that sought to be admitted and/or suppressed for the trial, and that the trial court had painstakingly made every effort to determine that the evidence comported with the law, and being that the evidence admitted during the trial complied with the law, this Court cannot conclude that there had been constitutional evidentiary errors in the Petitioner's trial, and accordingly, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this claim by a preponderance of the evidence.

**G.    Instructions to the jury**

No evidence or argument was made to this Court supporting this ground. Further, a review of the trial record is devoid of any objections concerning jury instructions and neither was such an issue brought up on appeal. From the trial transcript, it appears to the Court that both the Petitioner's trial counsel and the State were able to agree on a number of instructions, and that the trial court was more than amenable to permit other limiting instructions on behalf of the Petitioner, without objection by the State. However, because there is no evidence before this Court to entertain a decision on this ground, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this claim by a preponderance of the evidence.

**H.    Claims of prejudice by the prosecutor**

This ground had been addressed at length under the sub-ground of ineffective assistance of trial counsel and concerning the Petitioner's argument about the State's Opening Statement, to which neither of the Petitioner's trial counsel objected, thereby, not preserving any objection to same. The Court does not agree with the Petitioner that he suffered from any prejudice by the State's attorney during the pre-trial hearings or during the trial. Further, a review of the trial record indicates that any issues pertaining to this ground were addressed during the criminal

proceeding or on appeal. Accordingly, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this claim by a preponderance of the evidence.

## I. Sufficiency of evidence

The Petitioner's claim that there was insufficient evidence to convict him is also without merit, as the trial judge had previously found that the evidence admitted at trial was in accordance to the applicable Rules of Evidence including controlling case law.

The Petitioner overlooks the trial testimony of Dr. George Wallace, who testified that during his examination of the second child, he had advised that the Petitioner had hurt him because "he punched me" and "touched me on my private parts."[102]  Also, Dr. Wallace testified that during his examination of the eldest child, she advised that the Petitioner had touched her as well, and when asked by Dr. Wallace where the Petitioner had touched her, she "pointed to the vaginal area." Further, the eldest child advised Dr. Wallace that the Petitioner had touched her with his "wiener" on both her "front and back" areas.[103]  Most notably, Dr. Wallace performed a physical examination of the eldest child and found injuries to her vagina and rectum which indicated trauma consistent with the child's statements of sexual abuse.[104]  In sum, Dr. Wallace opined that the child had been a victim of sexual abuse. Although Dr. Wallace had not been informed of the child's prior sexual abuse by her biological father, Dr. Wallace opined that the scarring of the child's rectum indicated that it was "six months or so old", and not several years old.[105]  Due to the age of the scar tissue, the jury was able to infer that the child sustained the injuries at the hands of the Petitioner and not her biological father.

---

[102] Trial Transcript, December 4 – 7, 2001, at page 194, lines 5 – 6.
[103] Id., at page 194, lines 19 – 22.
[104] Id. at page 195 – 197.
[105] Id. at page 199, lines 6 – 13.

The next witness to testify was Phyllis Hasty, who advised that the second child initially accused the Petitioner of abuse, but then recanted during his interview with Susan McQuaide.[106] Additionally, Ms. Hasty testified that the two elder child victims failed to identify the Petitioner as a perpetrator to Ms. McQuaide. Ms. Hasty also testified that she was aware that the two elder children disclosed that they had been molested by their biological father when they first came to her for counseling for the abuse and for attention deficit monitoring.[107] Indeed, Ms. Hasty testified that she was "shocked out of the water" when the eldest child disclosed sexual abuse by the Petitioner when Ms. Hasty had never been presented with such information.[108] Of importance here, Ms. Hasty testified that the eldest child, who was the most vocal of the children, provided her with more detail of the abuse she suffered by the Petitioner:

> She said, he put his weenie in my bird, and she described - - and that is - - and she pointed to her vagina and called that - - that's what she calls her private parts, and she said this happened a lot of times at my house; she said he kissed me in mouth, and my bird, and my butt; she said he put his weenie in my butt and he made me put my mouth on his weenie; he licked my bird; she said his weenie got big and that nasty, yucky, yellow stuff gets in my mouth and it's [sic] gross; she stated he put his finger up my butt and up my bird; he said he would kill me with a knife if I told, or he would kill my mommy; he showed me nasty movies, and I saw him do nasty stuff to my brothers and sisters, too.[109]

In addition, three of the four children victims "have said on one occasion or another that at times the four children would be told to perform oral sex on each other, and they stated that the [youngest child, M.H.] just giggled and thought it was silly and just did what they told him to do[.]"[110] Due to the children's "sexualized behavior" they experienced many problems with interacting with other children and Ms. Hasty testified that she had worked with the children to

---

[106] Id. at page 215, lines 5 – 11.
[107] Id. at page 219, lines 23 – 24 and at page 220, lines 1 – 8.
[108] Id. at page 220, lines 17 – 24.
[109] Id. at page 223, lines 9 – 17.
[110] Id. at page 224, lines 6 – 9.

teach them appropriate boundaries.[111] The trial transcript is replete with references to the children's fear of the Petitioner at the time and that at least the two elder children were afraid that the Petitioner would do something to them if they had disclosed the abuse.

In sum, based on the trial records, the testimonies during the omnibus hearing, as well as the deposition testimonies, the Court **FINDS** and **CONCLUDES** the Petitioner has failed to prove his claim of insufficient evidence to convict by a preponderance of the evidence.

**J.    Severer sentence than expected**

This ground was not addressed during the omnibus hearing but was mentioned in the Petitioner's petition for relief, specifically that the Petitioner faced a minimum of one hundred years before he is eligible for parole and that the sentence is disproportionate to the offenses as to violate Article III, Section 5 of the West Virginia Constitution which parallels the Eighth Amendment to the United States Constitution and its prohibition against cruel and inhuman treatment. Nevertheless, given the Petitioner's sentence for the offenses to which a jury of his peers convicted him, this Court cannot agree that his sentence is disproportionate to the character and degree of the offenses pursuant to *State v. Vance*, 164 W. Va. 216 (1980). The West Virginia Supreme Court of Appeals recognized that:

> Punishment may be constitutionally impermissible, although not cruel or unusual in its method, if it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends the fundamental notions of human dignity, thereby violating [Article III, Section 5 of the West Virginia Constitution] that prohibits a penalty that is not proportionate to the character and degree of an offense.

*See*, Syl. Pt. 5, *State v. Cooper*, 172 W. Va. 266 (1983).

The *Cooper* Court recognized that there are two tests to determine whether a sentence is so disproportionate that it violates the aforementioned constitutional provision. First, a subjective

---

[111] Id., lines 20 – 24.

66

test: Does the sentence shock the conscience? If the sentence cannot pass this test, then this Court need not inquire further. However, if the sentence does not shock the conscience the disproportionality challenge must be reviewed under more objective factors, including the nature of the offenses, the Petitioner's past criminal history, and the Petitioner's proclivity to engage in violent acts. *See, also, State v. Martin*, 177 W. Va. 758 (1987); *State v. Glover*, 177 W. Va. 650 (1987); *State v. Buck*, 173 W. Va. 243 (1984).

The underlying criminal matter was not the Petitioner's first foray into the criminal justice system. For the disposition hearing in the underlying criminal case, the trial court reviewed the pre-sentence investigation report which outlined the Petitioner's very serious and violent criminal history. The trial court reviewed both the mitigating and aggravating factors to arrive at the appropriate sentence for the Petitioner's convictions: Although the Petitioner at the time of his disposition was fairly young (32 years of age), his criminal record which included a guilty plea to felony Breaking and Entering and misdemeanor Assault in 1988 (stemming from two separate indictments for Breaking and Entering and Malicious Wounding); a probation revocation in 1990 due to arrests for misdemeanor Battery and two counts of misdemeanor Driving Revoked for DUI; when released on parole on June 17, 1992, subsequently on July 27, 1992 he was charged with First Degree Murder for killing his wife at the time, Linda Marie B⟨ ⟩ to which he later entered a guilty plea to Voluntary Manslaughter, a lesser included offense.

Not surprisingly, the Petitioner had been on parole for a number of years, and as a result of the numerous offenses, the Petitioner's parole was revoked on January 9, 1993 and he was later sentenced on January 15, 1993 on the Voluntary Manslaughter charge to not less than one and no more than five years to run concurrent with his Escape charges brought by the Division of

Corrections. The trial court reviewed Division of Corrections records that indicated that the Petitioner was released on parole March 13, 1996 and was arrested on June 24, 1996 for parole violations and his parole was again revoked on July 12, 1996. The Petitioner was again released on parole on July 8, 1999 and was subsequently revoked again on December 30, 1999. Additionally, the trial court reviewed the underlying criminal offenses that spanned from the time period of July 1999 through November 1999.

The trial court also reviewed prior psychological evaluations that had been done on the Petitioner, which revealed that the Petitioner was diagnosed with anti-social personality disorder as well as problems with alcohol and substance abuse. The record shows that the trial court was further influenced by the fact that the Petitioner's victims in the underlying matter involved four very young children and coupled with the extensive criminal record involving crimes of violence; accordingly, the trial court handed down what it deemed the appropriate sentence for the crimes the jury found the Petitioner guilty.

The sentences executed by the trial court were within the bounds of the law for each offense. Further, it is within a trial court's discretion to run such sentences concurrently or consecutively. *See*, W. Va. Code § 61-11-21.

In sum, this Court's conscience is not shocked by the length of the Petitioner's sentence. The crimes for which the Petitioner was convicted occurred over a period of several months and only shortly after having moved in with his then wife, Jennifer W.   who he had met, along with the young victims herein, while he was still an inmate at Huttonsville Correctional Center. In view of the nature of the offenses committed, as well as the nature of the Petitioner's character, his psychological profile and his criminal history and propensity for violence, this Court cannot conclude that the sentence from which he seeks habeas relief violated the

68

proportionality principles contained in this State's Constitution. *See, e.g., State v. Ross*, 184 W. Va. 579 (1990).

Accordingly, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this claim by a preponderance of the evidence.

## K. Excessive sentence

The penalty for Sexual Assault – First Degree is no less than fifteen years to no more than thirty-five years in the state penitentiary pursuant to West Virginia Code Section 61-8B-3. The penalty for Sexual Abuse by a Custodian is no less than ten years to no more than twenty years in the state penitentiary pursuant to West Virginia Code Section 61-8D-5. The Petitioner had been convicted of thirty-one counts of Sexual Abuse – First Degree and convicted of seventy-four counts of Sexual Abuse by a Custodian. He was sentenced to an indeterminate term of one hundred to two hundred twenty years in prison, where the trial court ordered some sentences to run consecutively with others and further suspending most of the sentences. The law clearly provided for this sentence, because the trial court had discretion to run the sentences concurrently or consecutively, as explained above. This sentence is not illegal, and therefore, not excessive under the law. Accordingly, the Court **FINDS** and **CONCLUDES** that the Petitioner has failed to prove this claim by a preponderance of the evidence.

The Court **FINDS** that the above grounds as contained in the Petitioner's *Petition* and/or presented during the habeas hearings have been fully and finally litigated and adjudicated in this proceeding with the Court concluding that they are without merit; that they fail to rise to the level of a constitutional claim recognizable in habeas; or that the Petitioner failed to meet his burden of proof. Further, any issues that should have been known, and were raised, are now

69

considered waived.

## VIII.   RULING

**WHEREFORE,** it is hereby **ORDERED, ADJUDGED,** and **DECREED** by this Court that the *Petition for Writ of Habeas Corpus* is **DENIED.**

The Petitioner is hereby advised of his right to appeal this Order to the West Virginia Supreme Court of Appeals. The Petitioner is advised that if he cannot afford to employ and attorney to handle his appeal, the Court will appoint him counsel for said purposes. This is a final order.

The Clerk is directed to forward a copy of this Order to the Petitioner at the Mount Olive Correctional Complex; to Thomas J. Gillooly, Esq., Counsel for the Petitioner; and to Melissa D. Davis, Esq., Counsel for the Respondent.

This matter, having accomplished the purpose for which it was instituted, it is hereby ordered **DISMISSED** and **OMITTED** from the docket of this Court.

**ENTERED** this the 26th day of __April__, 2012.

_____
**OMAR J. ABOULHOSN, CHIEF JUDGE**
9th Judicial Circuit of Mercer County